Rick JAGER, Appellant,

v.

STATE of Alaska et al., Appellees.

STATE of Alaska et al., Cross-Appellants,

v.

Rick JAGER, Cross-Appellee.

Nos. 2057, 2084.

Supreme Court of Alaska.

June 4, 1975.

John S. Hedland, of Rice, Hoppner, Blair & Hedland, James D. Grandjean, of Alaska Legal Services Corp., Anchorage, for appellant and cross-appellee.

Andrew E. Hoge, of Robison, McCaskey, Strachan & Hoge, Anchorage, for Alaska Public Services Corp.

Norman C. Gorsuch, Atty. Gen., Juneau, Timothy G. Middleton, Asst. Atty. Gen., Anchorage, for State and Alaska Public Utilities Comm.

## OPINION

Before RABINOWITZ, C. J., and CONNOR, ERWIN, BOOCHEVER and FITZGERALD, JJ.

FITZGERALD, Justice.

In this appeal appellant Rick Jager asks this court to reverse a judgment of the superior court which affirmed a Public Utilities Commission (commission) order that approved the Alaska Public Services Corporation (APSC) [1] tariff rates PI and PPI

---

1. Alaska Public Services Corporation was known as Anchorage Natural Gas Corporation at the time the proceedings before the P.U.C. were initiated. Alaska Public Services Corporation was a subsidiary of the Alaska Pipeline Company at that time. Today, APSC is known as Alaska Gas and Service Company, a division of Alaska Interstate Company.

and dismissed a complaint of discrimination in the structure of APSC's then existing rate schedule. APSC has cross-appealed from the decision of the superior court alleging error in that court's denial of APSC's motion to dismiss on procedural grounds.[2]

Jager's appeal raises important questions concerning the nature of proceedings before the Public Utilities Commission, the extent of the commission's discretion in the face of a claim of discriminatory rates, and burdens of proof in rate proceedings.

## I. THE CROSS APPEAL

■ Cross-appellant urges this court to dismiss Jager's appeal from the commission to the superior court for failure to provide the superior court a concise statement of points on appeal under Appellate Rule 9(e) [3] or a specification of errors in his brief under former Supreme Court Rule 11(a)(6).[4] Cross-appellant argues that A S 44.62.560(d) [5] makes the Appellate Rules applicable in appeals from an administrative body to the superior court. Cross-appellee contends that no specific procedure exists for administrative appeals.

AS 44.62.560 clearly states that analogous rules of court governing appeals in civil matters shall be followed when the Administrative Procedure Act is silent.[6] This court has, however, repeatedly recognized that Appellate Rule 46 [7] condemns inflexible application of the rules and requires their relaxation in the interests of justice.[8] Under the standard set forth in

Alaska Pipeline Company has not been made a party to this appeal.

2. The parties have not raised the issue of Jager's standing to sue in this appeal. We make no comments on that issue in this opinion.

3. At the time Jager took his appeal to the superior court Rule 9(e) provided:

 *Statement of Points.* The appellant shall serve and file with his designation a concise statement of the points on which he intends to rely on the appeal. The court will consider nothing but the points so stated. On motion, and for cause, the statement of points may be supplemented subsequent to the filing of the designation of record.

4. At the time Jager took his appeal to the superior court Rule 11(a)(6) provided:

 A specification of errors relied upon which shall be numbered and shall set out separately and particularly each error intended to be urged. When the error alleged is to the admission or rejection of evidence, the specification shall quote the grounds urged at the trial for the objection and the full substance of the evidence admitted or rejected, and refer to the page number in the transcript as contained in the record on appeal where the same may be found. When the error alleged is to the charge of the court, the specification shall set out the part referred to verbatim, whether it be in instructions given or in instructions refused, together with the grounds of the objections urged at the trial. When findings are specified as error, the specification shall

state as particularly as may be wherein the findings of fact and conclusions of law are alleged to be erroneous. When the error alleged is to a ruling upon the report of a referee or a master the specification shall state the objections to the report and the action of the court upon such objections.

5. AS 44.62.560(d) provides:

 (d) Upon order of the superior court, appeals may be taken on the original record or parts of it. The record may be typewritten or duplicated by any standard process. Analogous rules of court governing appeals in civil matters shall be followed where this chapter is silent, and when not in conflict with this chapter.

6. *See* Mobil Oil Corporation v. Local Boundary Commission, 518 P.2d 92, 97 (Alaska 1974).

7. Appellate Rule 46 provides:
 *Construction.*
 These rules are designed to facilitate business and advance justice. They may be relaxed or dispensed with by this court where a strict adherence to them will work surprise or injustice.

8. Torres v. State, 519 P.2d 788 (Alaska 1974) ; Cook v. Aurora Motors, Inc., 503 P.2d 1046 (Alaska 1972) ; Orbeck v. Wheeler Constr. Co., 394 P.2d 781 (Alaska 1964). We have recently applied the provision for relaxing the rules to another case in which there was confusion as to the procedure for taking appeals from administrative agencies. McCarrey v. Commissioner of Natural Resources, 526 P.2d 1353 (Alaska 1974).

*McCarrey v. Commissioner of Natural Resources* [9] we conclude that a strict application of the rules to this case would substantially injure cross-appellee while their relaxation will not prejudice cross-appellant. Dismissal at this stage of the proceedings would be contemptuous of Jager's good faith efforts to pursue his complaint throughout four years of proceedings. It is, moreover, clear from the record below that APSC was at all times fully cognizant of the contested issues.[10]

## II. THE FACTUAL SETTING

APSC is the primary distributor of natural gas in the area of Anchorage, Alaska. The company purchases gas from its parent corporation, Alaska Pipeline Company, which it then distributes for resale by means of a system of pipelines and compressors to several classes of customers pursuant to a published tariff.[11] The issues presented in this appeal arise from a proposal for new rates made by APSC on December 5, 1969, pursuant to AS 42.05.411.

The proposed rates, PI and PPI,[12] were to be introduced as alternatives to the then existing rates P and PP for power plant service to the City of Anchorage Municipal Light and Power Department (city) and Chugach Electric Association (Chugach) respectively. Rates PI and PPI differed in three significant respects from rates P and PP, by providing for: (1) a seasonal reduction of $.005 per therm or $.05 per MCF during the months April through September; (2) a minimum monthly bill of $60,000 under PI and $1,000 under PPI; and (3) contractual interruptibility [13] such that the customer could, with not less than

two-hour notice, be interrupted for not more than ten days in any calendar month.[14] The commission and superior court hearings focused primarily on rate PI on which we will focus herein.

On January 6, 1970, Rick Jager, a residential customer of APSC, filed a complaint and opposition to proposed rates PI and PPI alleging the rates to be unjustly discriminatory. Jager coupled his opposition to the proposed rates with an opposition to discrimination under the existing rate structure. This discrimination was alleged to take the form of preferential treatment to military, power generation, and already interruptible customers at the expense of residential customers.

In his complaint Jager outlined the classes of customers and average rate structure as follows:

Non-power customers

| Class | Average Rate per Mcf |
|---|---|
| A (residential) | $1.49 |
| AA | 1.63 |
| B (Large Residential) | 1.34 |
| BB | 1.47 |
| C (Commercial) | .90 |
| CC | .91 |
| SK (Soldotna-Kenai) | .82 |
| I (Interruptible) | .77 |

Power customers

| Class | Average Rate Per Mcf |
|---|---|
| P (City of Anchorage) | $ .38 |
| PP (Chugach Electric Association-Knik Station) | .46 |
| PP (Chugach Electric Association-International Station) | .41 |
| PP (Shell Oil) | .55 |
| PP (Pan American Oil) | .49 |

The price for military customers was $.34 per MCF.

9. 526 P.2d 1353, 1355 (Alaska 1974).

10. *Cf.* Rego v. Decker, 482 P.2d 834 (Alaska 1971).

11. *See* p. 1104 *infra.*

12. The letter codes P, PP, PI, PPI indicate that a rate applies to a power ("P") customer. Inclusion of an "I" indicates that the rate is interruptible.

13. "Interruptibility" is a standard feature in utility rates which permits a utility to inter-

rupt service to a customer when there is insufficient capacity. *Interruption* for capacity related reasons is to be distinguished from *curtailment* for mechanical reasons. An interruptibility feature is not required to sanction curtailment. "Therm" is a unit of heat equivalent to 100,000 British thermal units. MCF stands for million cubic feet, 1 MCF is equivalent to 1,000,000 British thermal units.

14. Other changes and differences between the two rates have no bearing on this appeal.

Shortly after Jager's filing, APSC moved to sever the complaint into its two separate issues. Jager opposed the motion and a hearing was scheduled for February 26, 1970, to consider the severance motion and other procedural matters. At that hearing the motion to sever was apparently dropped by APSC in return for a stipulation by Jager allowing the proposed rates to be put into effect immediately, prior to final determination of their propriety by the commission. The stipulation also provided that if the commission eventually determined the proposed rates to be improper, the rates would revert to their former or some intermediate level. For purposes of computing rate of return APSC would be deemed to have sold the gas at the previously existing rates and would be subject to an order for any adjustments or cash distributions necessary to relieve customers from any disadvantage occasioned by the lost revenues. The conditions imposed on APSC by the February 26, 1970 stipulation remain in force.

After the initial hearing, the parties spent more than a year in preparation for a hearing on the merits. These efforts were punctuated by a motion to produce by Jager and a discovery order issued by the commission on May 27, 1971. The failure of APSC to make available certain data was raised as an important issue before the superior court. Jager continues to argue the point in this appeal. There is some dispute whether APSC ever fully complied with the discovery order, particularly as to data showing allocation of costs and peak use and load factors. Because the trial court did not rule on this issue, we will not decide whether there was compliance with the discovery order. It is clear, however, that the type and quality of information before the commission is an important factor in this appeal.

At the prehearing conference on July 16, 1971, the commission requested, and the parties subsequently filed, additional documentation on the question of discrimination in the rate structure. Based on the memoranda and exhibits submitted prior to the formal hearing, the commission concluded that Jager had not established a prima facie case requiring an investigation of the entire rate structure. At the outset of the formal hearing on October 28, 1971, the commission denied that portion of Jager's complaint requesting an investigation into the existing rates.

The commission conducted two days of hearings confined to the proposed rates for power generation. APSC offered three principal justifications for the proposed rates: (1) the need to meet competition from Chugach Electric Association, the Eklutna hydroelectric project, and from other potential suppliers of gas in the Anchorage area; (2) the need to achieve interruptibility as one means of meeting a short-fall in capacity; (3) the desirability of shifting purchase of gas from winter to summer to create a more even load factor and to ameliorate capacity problems. APSC's presentation consisted essentially of exhibits on cost allocation, written arguments for the rates, and testimony from Dale Teel, APSC president, James L. Montgomery, APSC accountant and treasurer, and Carrol Oliver, manager of the city utility. Jager contested each of APSC's asserted justifications by means of cross-examination and introduction of his own exhibits comprised mostly of data from APSC corporate reports. On March 17, 1972, the commission issued its findings of fact and an order which sustained APSC's asserted justifications and dismissed Jager's complaint.

■ Jager appealed the commission's order to the superior court pursuant to AS 22.10.020 and AS 42.05.551.[15] In addition

---

15. AS 22.10.020 provides in part: "The superior court has jurisdiction in all matters appealed to it from a subordinate court, or

administrative agency when appeal is provided by law." AS 42.05.551 provides: "All final orders of the commission are subject to judi-

to asserting abuse of discretion by the commission, the appeal alleged numerous procedural errors. The superior court judge heard extensive argument, particularly on the issues of income tax allocation and interruptibility. He took additional testimony on the question of interruptibility but subsequently ordered the testimony stricken.[16] The superior court determined that the commission had abused its discretion when it dismissed the complaint of discrimination in the existing rate structure. The court, however, concluded that the error had been cured by the admission of evidence on the rate structure question during the hearing on the specific rates. Concerning the protest to the rates PI and PPI, the superior court found the commission order supported by the findings and the findings supported by the evidence. Jager now requests this court, in the exercise of its final appellate jurisdiction, to remand the case to the commission with instructions to disapprove rates PI and PPI and to conduct a thorough investigation of the existing APSC rate structure.

## III. DISCRIMINATION IN THE RATE STRUCTURE

■ At the outset, we approach the issues independently of the superior court which was acting as an intermediate court of appeal.[17]

Jager contends that the data before the commission constituted a prima facie case of discrimination in the rate structure upon which the commission was required to act. Appellant further argues that a prima facie case of discrimination was made out even under APSC's analysis, which shows net profit as a percentage of cost for firm customers double that for non-firm customers (20.4% to 10.5%).[18]

■ Appellant's complaint was filed under former AS 42.05.580 which provided that upon complaint, "[t]he commission shall proceed, with or without notice, to make [an] investigation of [the complaint] which it considers necessary or convenient." It is clear from the statutory language that the legislature has granted the commission discretionary authority to consider complaints and undertake rate investigations.[19]

■ There is no "right" to have the commission act. The matter of rate discrimination and investigation is such that the commission must be free to weigh the charges and data presented and the costs to the public and the utility, against which a complaint has been brought, to determine whether further proceedings are in the public interest.[20]

cial review in accordance with AS 44.62.560–44.62.570 of the Administrative Procedure Act."

16. While we are not called upon to review the nature of the proceedings before the superior court, it is apparent that there was confusion below concerning the propriety of the superior court receiving additional evidence. That it is proper for the court to augment the record is made clear in AS 44.62.570(d).

17. State of Alaska v. Marathon Oil Co., 528 P.2d 293, 298 (Alaska 1974).

18. Firm customers are those guaranteed non-interrupted service. Non-firm customers are those whose supply of gas may by contract be interrupted for any reason specified in the contract.

19. The revised statute, AS 42.05.141, provides:

The Alaska Public Utilities Commission may . . . (2) investigate, upon complaint or upon its own motion, the rates, classifications, rules, regulations, practices, services and facilities of a public utility and hold hearings on them ;

20. See Wisconsin v. F. P. C., 373 U.S. 294, 311–314, 83 S.Ct. 1266, 1275–1277, 10 L.Ed. 2d 357, 369–371 (1963) ; Amalgamated Meat

■ We must determine whether the commission abused its discretion in dismissing the complaint of discrimination in the rate structure. Our review of this question is governed by AS 44.62.570,[21] the scope of review section of the Alaska Administrative Procedure Act. That section is made applicable to review of final orders of the Public Utilities Commission by AS 42.05.551.[22] The Administrative Procedure Act provides the court several options in exercising its reviewing authority and establishes specific criteria for review. This court, in interpreting AS 44.62.570, has chosen in several instances not to exercise independent judgment of the facts on appeal. *Pan American Petroleum Corp. v. Shell Oil Co.*, 455 P.2d 12, 21 (Alaska 1969); *Interior Paint Company v. Rodgers*, 522 P.2d 164, 170 (Alaska 1974); *Mobil Oil Corporation v. Local Boundary Commission*, 518 P.2d 92, 98 (Alaska 1974). We hold that the independent judgment standard in this appeal is inappropriate for review of the commission's decision not to initiate a thorough rate investigation.

We also find the substantial evidence test inappropriate for review of the commission's decision to deny a thorough rate investigation.[23] The substantial evidence test is traditionally employed to review factual determinations made by an agency in the course of its proceedings.[24] The commission's decision involved factors within its particular expertise and considerations of the value of a thorough investigation which are not evidence in the sense contemplated by AS 44.62.570(c).

■ The commission's decision whether to conduct a rate investigation is similar to the type of decision involving agency expertise in a mixed law and fact setting subject to the "reasonable basis" standard of review outlined in *Kelly v. Zamarello,* 486 P.2d 906, 916–917 (Alaska 1971). The reasonable basis standard permits the court to consider factors of agency expertise, policy, and efficiency in reviewing discretionary decisions.[25] It is similar to the standard of "unreasonable, arbitrary, and capricious action" under which actions committed to agency discretion are traditionally reviewed when they are subjected to review at all.[26] The reasonable basis

---

Cutters & Butcher Work. v. Connally, 337 F.Supp. 737, 758 (D.C.D.C.1971).

**21.** AS 44.62.570 provides in part:

(b) Inquiry in an appeal extends to the following questions: (1) whether the agency has proceeded without, or in excess of jurisdiction; (2) whether there was a fair hearing; and (3) whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.

(c) The court may exercise its independent judgment on the evidence. If it is claimed that the findings are not supported by the evidence, abuse of discretion is established if the court determines that the findings are not supported by (1) the weight of the evidence, or (2) substantial evidence in the light of the whole record.

**22.** *Supra,* note 15.

**23.** In interpreting AS 44.62.570 this court has recognized at least four principle standards of review of administrative decisions. These are the "substantial evidence test" for questions of fact; the "reasonable basis test" for questions of law involving agency expertise; the "substitution of judgment test" for questions of law where no expertise is involved; and the "reasonable and not arbitrary test" for review of administrative regulations. Kingery v. Chapple, 504 P.2d 831, 834–835 (Alaska 1972); Swindel v. Kelly, 499 P.2d 291, 298 (Alaska 1972); Kelly v. Zamarello, 486 P.2d 906, 911, 916 (Alaska 1971).

**24.** *See* Keiner v. City of Anchorage, 378 P.2d 406 (Alaska 1963).

**25.** 486 P.2d at 916.

**26.** Office Employees I. U. v. N. L. R. B., 353 U.S. 313, 320, 77 S.Ct. 799, 803, 1 L.Ed.2d 846, 851 (1957); Sugarman v. Forbragd, 405 F.2d 1189, 1190 (9th Cir. 1969), *cert. denied,*

standard is appropriate for determining whether the agency decision has been undertaken "in the manner required by law." [27]

One indication whether an agency has proceeded in the manner required by law is compliance with its own regulations. No regulation had, however, been promulgated at the time the commission acted upon Jager's complaint. · Unlike the situation in *Mukluk Freight Lines v. Nabors Alaska Drilling*, 516 P.2d 408 (Alaska 1973), in which we invalidated an order of the Alaska Transportation Commission for failure to adopt procedural rules, the Public Utilities Commission in the Jager proceeding determined in advance ascertainable and reviewable procedures. Thus, under the circumstances of this case we do not find *Mukluk* and the lack of regulations dispositive.

▬▬▬ The commission dismissed Jager's objection to the rate structure on the basis that no showing had been made that the "public interest would be served by such an investigation." This standard is similar to the one subsequently adopted by the commission. 3 AAC 48.130(f), promulgated pursuant to AS 42.05.151(b), provides:

a formal investigation will not be instituted on complaint except for good cause shown to the commission's satisfaction by the complainant.

Under the "reasonable and not arbitrary" standard for review of administrative regulations stated in *Kelly v. Zamarello*,[28] we uphold the standard employed by the commission. The commission regulation embodies the discretion to undertake investigations or dismiss complaints granted to the commission by the legislature. "Good cause shown" requires the commission to act when a complainant brings evidence before it amounting to probable cause that discrimination exists.[29] Thus, the commission is not compelled to act by the mere filing of a complaint nor can the commission arbitrarily deny relief to a citizen who can demonstrate a sufficient probability that his complaint is valid.[30] We now apply the aforementioned standards to the instant case.

When the commission denied Jager's request for an investigation into the APSC rate structure, it had before it only the pre-hearing memoranda. The key papers were two exhibits showing costs and revenues for firm and non-firm customers. APSC accepted essentially all of Jager's allocations except as to its income tax and load factor.[31] Jager allocated income taxes as an operating cost on a commodity or

395 U.S. 960, 89 S.Ct. 2103, 23 L.Ed.2d 747 (1969); K. Davis, Administrative Law Treatise, § 28.16 (1970 Supp). *Cf.* Groh v. Egan, 526 P.2d 863, 866 (Alaska 1974); Kingery v. Chapple, 504 P.2d 831, 835 (Alaska 1972). Decisions similar to that under review here are traditionally committed to agency discretion. *See* Wisconsin v. F. P. C., 373 U.S. 294, 83 S.Ct. 1266, 10 L.Ed.2d 357 (1963). In many jurisdictions and under the uniform APA § 10 actions committed to agency discretion by law are not subject to judicial review. The Alaska Administrative Procedure Act does not contain language similar to that in Federal law.

27. AS 44.62.570(b).

28. 486 P.2d 906 (Alaska 1971).

29. Jaspan v. Philadelphia Electric Co., 26 P.U.R. (N.S.) 376 (F.P.C.1938).

30. *See* Pennsylvania Gas & Water Co. v. F. P. C., 150 U.S.App.D.C. 151, 463 F.2d 1242 (1972); Dyestuffs and Chemicals Inc. v. Fleming, 271 F.2d 281 (6th Cir. 1959).

31. Load factor is used to describe the ratio between a customer's annual usage and his peak day usage multiplied by 365 (days). As the load factor becomes higher, i. e., the closer annual usage approaches peak day usage x 365, the system becomes more efficient and the per unit cost decreases. American Gas Association, *Gas Rate Fundamentals* 148–149 (Rev.Ed.1969). The dispute over the correct load factor was not a factor in the PUC's decision not to undertake a full rate investigation.

volume basis;[32] APSC apportioned the tax in proportion to net income before tax- es. The allocation data are summarized in the table below:

| | Non-firm Consumers | | Firm Consumers | | Total |
|---|---|---|---|---|---|
| Volume gas sold | 12,827,956 mcf | 75% | 4,394,684 mcf | 25% | 17,222,640 mcf |
| Revenue | $5,460,000 | 47% | $6,190,000 | 53% | $11,650,000 |
| Operating costs without tax | $4,310,000 | 51% | $4,160,000 | 49% | $8,470,000 |
| Operating costs with tax as commodity cost | $5,500,000 | 53% | $4,850,000 | 47% | $10,350,000 |
| profit (loss) | ($40,000) | | $1,340,000 | 100% | $1,300,000 |
| Pre-tax profit | $1,150,000 | 36.2% | $2,030,000 | 63.8% | $3,180,000 |
| Income tax apportioned on | | | | | |
| Pre-tax profit | $700,000 | 37% | $1,180,000 | 63% | $1,880,000 |
| Profit (loss) | $450,000 | 34.6% | $850,000 | 65.4% | $1,300,000 |

The data presented by Jager shows a subsidization of power customers by firm customers. All company profit is derived from the firm customers while power and military customers are served at a loss. The average difference between rates for power (the city) and firm customers which generated the profits was $1.01 ($.41–$1.42) in 1969 and $1.03 ($.38–$1.41) in 1970.

Part of the difference in average rates can justifiably be accounted for by economies of scale in customer costs, and differences in capacity, transmission, and distribution costs. Since only that discrimination which is unreasonable is unlawful, discrimination based on justified differences in the cost of service or which is otherwise within the zone of reasonableness is permissible.[33] When, how-

32. APSC does not dispute the designation of income tax as an operating as opposed to a transmission or distribution cost. The dispute concerns allocation of tax on a volume (according to proportionate quantity of gas used) as opposed to capacity (according to the proportion of system capacity required to serve a particular class of customers) or customer (apportioned according to the relative cost of customer accounting, collecting, promotion and the like) costs. *Gas Rate Fundamentals*, note 31 *supra* at 146, 218, 220.

33. AS 42.05.391(a) provides:
*Discrimination in rates.* No public utility may, as to rates, grant an *unreasonable* preference or advantage to any of its customers or subject a customer to an *unreasonable* prejudice or disadvantage. No public utility may establish or maintain an

ever, the rate structure is such that one class of customers subsidizes another, discrimination may pass beyond its permitted scope and become undue or unreasonable.[34] On the basis of the data presented by Jager it was an unreasonable and arbitrary abuse of discretion for the commission to dismiss the complaint as to the existing rate structure.

■■■ Jager's cost allocations are, however, based on a controverted method of income tax allocation.[35] The commission adopted the method proposed by APSC. While we leave the question of the proper tax allocation method open for the commission, it is clear that the allocation may not be based on existing pre-tax profits. Use of existing pre-tax profits builds into new rates any existing discrimination in the rate structure.[36] We need not establish a tax allocation method in this case because sufficient evidence of discrimination was shown to warrant further inquiry regardless of the allocation method employed. We also note that the record does not provide a sufficient basis on which to review the appropriateness of the allocation method chosen, other than as to our determination that pre-tax profits should not be used.

■■■ Even if the commission was justified in rejecting Jager's method of tax allocation, the data presented by APSC shows a 2–1 discrepancy in the ratio of profit to cost. Firm and non-firm customers are responsible for roughly equal oper-

ating costs with taxes excluded (49% to 51%). The firm customers, however, returned 53% of total revenues and 63% of pre-tax profits on only 25% of the volume of gas sold. Certainly differences of this magnitude constitute a sufficient showing to require at least some additional investigation by the commission. When one considers that the correct method of income tax allocation was disputed, the need for further investigation becomes even more apparent. As we said in *Oil Heat Institute v. Alaska Pub. Serv. Corp.*, 515 P.2d 1229, 1233 (Alaska 1973):

> The P.U.C.'s simple refusal to consider a meritorious complaint cannot be shrouded or made to vanish by resort to the "reasonable basis" exhortation. That which is plainly unreasonable cannot be made reasonable merely by a play on words.

At the least the commission must offer some justification for its dismissal based on a prior determination of allocation methods, previous adjudication of permissible discrimination, or other such factors.

■■■ APSC argues that even if the commission erred in dismissing the complaint of discrimination in the rate structure, the error was rendered harmless during the hearing on rates PI and PPI. Although APSC's argument is not stated clearly, it appears to be based on the rationale adopted by the lower court that: (1) Jager was given a hearing on the question of discrimination in the rate

---

unreasonable difference as to rates, either as between localities or between classes of service. (emphasis added)

This is in keeping with long-established precedent that uniform rates are not required and that only unreasonable or undue preferences are forbidden. F. P. C. v. Sierra Pacific Power Co., 350 U.S. 348, 355, 76 S.Ct. 368, 372, 100 L.Ed. 388, 395 (1956); Northern Pacific Railway Company v. North Dakota, 236 U.S. 585, 598–599, 35 S.Ct. 429, 434, 59 L.Ed. 735, 742–743 (1915); Durant v. City of Beverly Hills, 39 Cal.2d 133, 102 P.2d 759, 762–763 (1940).

*See also* Re Springfield Gas Light Co., 70 PUR (N.S.) 82 (Mass. D.P.U.1947); *Gas Rate Fundamentals*, note 31 *supra* at 143–149.

34. *See* F. P. C. v. Sierra Pacific Power Co., 350 U.S. 348, 355, 76 S.Ct. 368, 100 L.Ed. 388, 395 (1956); Carpenter v. Pennsylvania Public Utility Commission, 141 Pa.Super. 447, 15 A.2d 473 (1940); Public Utility Commission v. Johnstown Water Co., 19 PUR 3rd 433, 450 (Pa.P.U.C.1951).

35. APSC also challenges Jager's data on load factors for power and firm customers. APSC, however, only disputed the tax allocation in Jager's presentation prior to the commission hearing. See note 32 *supra*.

36. *See* Iowa Public Service Co. v. Sioux City, 256 Iowa 547, 128 N.W.2d 248, 259 (1964).

structure through cross-examination of APSC witnesses; and (2) the commission had not dismissed outright the complaint of discrimination in the rate structure but had merely determined to hear testimony regarding rates PI and PPI in connection with the complaint of improper rate making. We cannot agree.

Jager asserts that if he had been granted a hearing on the question of discrimination, additional evidence would have been introduced. We cannot conclude otherwise, for the issues contested during the hearing before the commission on rates PI and PPI were primarily concerned with those rates. There is nothing in the record to indicate that the commission, having stated at the outset that the hearing would be limited in scope, subsequently permitted a hearing on the issue of discrimination in the rate structure. Nor does the record reveal that the commission re-evaluated its initial decision to dismiss. Neither the record nor final order reveals additional consideration by the commission of the charge of discrimination in the rate structure. While the meaning of "hearing" varies in different administrative settings, it is apparent that a meaningful hearing in the instant situation includes the opportunity to introduce evidence in addition to cross examination.[37]

It is necessary to order a remand for further proceedings on the issue of discrimination in the rate structure. The commission must afford Jager an opportunity to present evidence on the issue of rate structure discrimination. The commission may consider evidence adduced at the earlier hearing which is pertinent to the issue of structural discrimination. The commission shall conduct a hearing consistent with its published regulations and usual practice on discrimination complaints.

## IV. RATES PI AND PPI

Jager continues to urge this court that the commission erred in approving rates PI and PPI. This issue is independent of our disposition of the rate structure questions.

The theory of Jager's claim is that the proposed rates PI and PPI compound existing discrimination in the rate structure and that they are unreasonable because they are unsupported by the justifications offered by APSC. Jager further asserts that the commission violated its legislative mandate and shifted the burden of proof from APSC to him.

The statute is clear that the party "who initiates a change in existing tariffs shall bear the burden to prove the reasonableness of the change." AS 42.05.421(d). To show that the commission violated the legislative mandate Jager points to the following language in the commission order: "Unless significant abuses are evident the commission does not intend to substitute its judgment for the judgment of the management of the respondents." This allegation raises significant questions about the manner in which the Public Utilities Commission exercises its regulatory functions.

We consider the challenged commission procedure in light of the reasonable basis test adopted by this court for review of agency decisions involving interpretation of a statute.[38] Our review of the record indicates that the commission did not shift the burden of proof from APSC to Jager. In establishing the procedure to be followed at the outset of the hearing, the commission put the burden upon APSC to prove the reasonableness of the new rates. APSC was required to go forward and justify its proposal which it attempted to do through formal introduction of prefiled testimony and the oral testimony of

---

37. *See* Appalachian Power Co. v. E.P.A., 477 F.2d 495, 503 (4th Cir. 1973). Although Jager introduced evidence concerning rates PI & PPI, he did not introduce evidence on discrimination in the rate structure.

38. Oil Heat Institute v. Alaska Public Service Corp., 515 P.2d 1229, 1233 note 1 (Alaska 1973). The question before the court at this stage of the case is whether the PUC has correctly interpreted its statutory duty in placing the burden of proof and determining the reasonableness of rates.

its president and treasurer. Jager was permitted to cross-examine and introduce his own testimony.

The procedure followed is sound. While some of the language in the commission's order is unfortunate, we understand it to mean only that the commission had first been satisfied by APSC's evidence that the rates were reasonable and thereafter turned to Jager to show otherwise, a showing he failed to make. This procedure, consistent with the statutory allocation of the burden of proof, is clearly reasonable.

 Jager challenges the commission's findings and conclusions on each of the three justifications offered by APSC to support the proposed rates. The questions involved, whether the proposed rates were designed to and could meet competition, shift sales of gas from winter to summer, and achieve interruptibility, are all questions of fact of the type traditionally reviewed under a substantial evidence standard.[39] It is under this standard that we turn to consider the record.

APSC first argued that it confronted, and reacted to, competition from at least three sources: alternative suppliers of natural gas, the lobbying of Chugach Electric Association, and dump power from Eklutna hydroelectric project. The commission concluded, "with respect to dump power only, a competitive condition clearly was present." APSC, however, continues to argue that it faces a genuine competitive threat from Chugach and from potential suppliers of natural gas.

The record is scant on all three types of competition, but particularly so with re-

spect to Chugach. The subject of competition from Chugach primarily involves certain lobbying by Chugach and a Chugach project called "Operation Breakthrough." When asked whether there was any other indication of a significant threat from Chugach, APSC president Teel responded, "that's the primary evidence I believe that exists."[40] The commission considered the evidence of lobbying efforts by Chugach to be of no weight.

 One other reference to Chugach concerned the sale of electricity by Chugach to the city utility, a possibility considered by the city in lieu of a third gas turbine. Mr. Oliver, the utility manager, testified, however, that the rate offered by Chugach was unacceptable. Since the burden of proof was on APSC to sustain the justifications asserted for the proposed rates, the commission's conclusion that a competitive condition did not exist with respect to Chugach must be sustained since no creditable evidence appears on the record to support the APSC contentions.

The spectre of potential new suppliers of natural gas was also raised as a justification for the more attractive rates proposed for the city and Chugach. Teel testified that bids had been invited by the city and that "x number" had been received. Teel, however, discounted the likelihood that a new supplier could offer competitive prices. Oliver contradicted Teel's statement in part, testifying that although bids had been requested, none had been received. The commission's conclusion that APSC had failed to prove that alternative suppliers constituted either a present or potential threat is supported by the record.[41]

---

39. *See* Keiner v. City of Anchorage, 378 P.2d 406, 411 (Alaska 1963) ; Interior Paint Company v. Rodgers, 522 P.2d 164, 170 (Alaska 1974).

40. Potential competition is also said to justify the higher minimum monthly provisions in the new rates. The monthly minimums are not seriously contested by Jager except to state that they are well below the lowest monthly bill under the old rates and so an illusory benefit to APSC.

41. We recognize, as urged by APSC, that potential competition is a legitimate factor to consider in the determination of a proper rate. The potential must, however, be present and not merely speculative. *Cf.* Union Sugar Co. v. Southern Counties Gas Co. of California, 74 PUR (N.S.) 490 (Cal.P.U.C.1947). There is no indication that the commission was not cognizant of and did not consider the potential of competition from alternate suppliers of natural gas.

The third source of potential competition offered by APSC was the direct sale of electricity from the Eklutna hydroelectric project to the city. APSC asserted that the proposed rate reduction was at least in part a response to a recent rate reduction by Eklutna and that a lower rate was necessary to prevent the city from increasing its use of Eklutna power. Jager responded in three ways. First, he asserted that the city's generation costs under the old rate P (approximately 6 mills/KWH) were considerably less than the standard rate of 9.3 mills/KWH from Eklutna while the city's generation costs under PI (approximately 5–5.6 mills/KWH) would continue substantially to exceed the new rate for dump power from Eklutna of 3 mills/KWH. Second, Jager pointed out that dump power is illusory as a competitive factor since it is not available. Third, he urged that APSC was in no position to argue that its proposal was designed to meet competition from Eklutna because the company had failed to undertake an analysis of the difference in costs of electricity to the city from APSC and from Eklutna.

The commission appeared troubled by the question of competition from Eklutna but concluded that dump power[42] is a genuine potentiality and does undercut the cost of generation of electricity by gas by 40%. In reaching this conclusion the commission had before it evidence that dump power had at one time been available but had been unavailable in recent years due to dry weather conditions. Jager's assertion that there can be no competition because the city must purchase 16 megawatts of electricity from Eklutna annually was discounted by the commission in light of the testimony that the city currently sells a large proportion of its contracted Eklutna purchases to Matanuska Electric Association.

■■■ Jager does not challenge the factual accuracy of the commission's conclusions concerning Eklutna electric production. He does, however, assert that the proposed rate reduction cannot meet any potential competitive threat posed by Eklutna and is therefore unreasonable. We agree that the commission's analysis is not concluded when it determines that potential competitors exist. The commission must also determine whether the proposed rates can effect the competitive situation.[43]

Evidence of the competitive impact of the proposed rates is scant. For APSC, Oliver testified that even a small variation in rate such as one mill amounts to a considerable cost when compounded by the large volume of electricity produced. The testimony indicated, however, that APSC had made no formal analysis of the competitive threat posed by Eklutna. The commission had before it only management assertions of "review" of the competitive situation and of the fragility of the rate structure.

■■■ The commission's conclusion that a five cent rate reduction is a reasonable response to a competitive threat from the Eklutna hydroelectric project indicates undue deference to management judgment. Some deference to management judgment is, of course, proper.[44] The commission may not, however, defer to bald assertions by management. This is so particularly when more compelling evidence, in the form of economic and statistical analyses and comparisons of the type which can be committed to record and be available for

42. Dump power is excess power from the Eklutna project which is normally available only in unusually wet seasons.

43. See City of Pittsburgh v. Pennsylvania Public Utility Commission, 165 Pa.Super. 519, 69 A.2d 844 (1949).

44. Deference to management discretion has frequently been the subject of discussion in rate proceedings. Some deference is clearly proper. See United Gas Pipe Line Co. v. Memphis L., G. and W. Div., 358 U.S. 103, 113, 79 S.Ct. 194, 200, 3 L.Ed.2d 153, 161 (1958); Public Service Commission v. Ely Light and Power Co., 80 Nev. 312, 393 P.2d 305, 311 (1964); Re Montana Power Co., 10 PUR (N.S.) 293 (Montana P.S.C.1935).

analysis by the commission and by a reviewing court, can be developed at reasonable cost.[45] It is apparent from Oliver's sketchy oral comparison of the relative cost to the city of electricity from Eklutna with electricity produced from gas and from the testimony of appellant's economist concerning the applicability of recognized economic standards to the competitive effect of various prices that such evidence was readily ascertainable on the question of competition from Eklutna. In view of the meager evidence adduced on the question of competition from Eklutna dump power and the ready availability of other compelling evidence, we conclude that the evidence is not such "as a reasonable mind might accept as adequate to support a conclusion" that competition from Eklutna justified the lower rates.[46]

 The second justification advanced by APSC focused on the interruptibility provision in the new tariffs.[47] In essence APSC asserted that the gas pipeline was running dangerously near capacity in 1969–1971, that incorporation of contract provisions for interruptibility in the tariff structure is a legitimate means of meeting capacity problems, and that the interruptible feature of the new rates enabled the

company to postpone installation of a compressor for one year. Jager contested the APSC position on several grounds. First, he argued that APSC has no capacity problems; second, that there is no interruptibility in fact, i. e., that APSC has never interrupted for capacity reasons; third, that the company continues to increase its pipeline capacity.

On the issue of interruptibility, Teel testified that APSC had inadequate capacity to supply its total market. He further testified that at one time when APSC capacity was 100 million cubic feet per day, delivery reached 99–101 million. APSC expected capacity problems to increase in the near future when APSC's suppliers decreased the wellhead pressure (one factor in capacity) of APSC's gas.

Countering APSC's position is evidence that APSC had never interrupted for capacity reasons. Teel unequivocally stated that APSC had never been forced to interrupt any customer for capacity reasons, although several curtailments had resulted from mechanical failures. This is buttressed by the statements of the city utility manager that the utility "absolutely" believes that APSC will continue to supply all its needs despite the interruptibility fea-

45. For further discussion of the need for supporting evidence see Re George Mitchell & Associates, 99 PUR 3d 113, 124 (F.P.C.1973). In that case Mr. Nassikas, dissenting, stated, "Rates approved without substantial evidentiary support and thus with no standard for appellate review are unlawful."

See also Scott Paper Co. v. United States, 372 F.Supp. 721, 730–732 (E.D.Pa.1974), aff'd, 419 U.S. 807, 95 S.Ct. 26, 42 L.Ed.2d 38 (1974); Re North Carolina Nat. Gas Corp., 99 PUR 3d 237 (N.C.U.C.1973); Re Southern California Edison Co., 100 PUR 3d 257 (Cal.P.U.C.1973).

In Re Jersey Central Power & Light Co., 66 PUR (N.S.) 129, 137 (N.J.Brd. of P.U.C. 1946), it is stated, "it further appears that the calculations . . . were not based upon a thorough study and analysis to determine the costs which, under the circumstances in this case, are related to volume of use and the extent and character of such relationship. . . . In view of the foregoing the Board finds that the calculations . . .

do not provide an adequate basis for determining the lowest rate for the sale of gas." Cf. Colorado-Wyoming Gas Co. v. F. P. C., 324 U.S. 626, 634, 65 S.Ct. 850, 854, 89 L.Ed. 1235, 1241 (1945); Application of Lewiston Grain Growers, 69 Idaho 374, 207 P.2d 1028, 1032 (1949).

46. Keiner v. City of Anchorage, 378 P.2d 406, 411 (Alaska 1963).

47. Interruptibility features are standard in natural gas tariffs. They are an accepted means of increasing capacity without expansion. Interruptibility generally lowers the rate to the consumer. See Wolf v. United Gas Public Service Co., 77 S.W.2d 1091 (Tex. Ct.Civ.App.1934); Re Washington Gas Light Company, 43 PUR 3d 250 (D.C.P.U.C.1962). Jager does not contest the use of interruptible rates per se. His objection goes only to the facts of the APSC tariff. Indeed, the APSC tariff has included interruptible provisions for years.

ture in the new rate. Testimony was also offered that APSC did continue to increase capacity after introducing the new interruptible rates although installation of at least one compressor was delayed one year due to the interruptible rates.

Testimony before the commission on the question of interruptibility was mostly in the form of impressions, theory, and conclusions. The complaint against "unscientific rate-making" voiced by Commissioner Stern in his dissenting opinion is particularly applicable to the interruptibility issue. While we hesitate to set precise guidelines on the type of data which the commission should require, it is apparent that the data on capacity and load factor presented to the superior court are more reliable than the evidence which was before the commission.[48] The presentation of actual load factors and capacity over a multi-year period is certainly more likely to lead to an informed decision and withstand judicial review than such conclusory statements as, "simply we didn't have enough capacity to deliver all the requirements of our total market." [49]

In light of the speculative nature of much of the testimony on the interruptibility question, we do not believe that the commission properly exercised its regulatory function. It is difficult to find APSC's capacity data reliable when Teel admitted that the company is not certain of its capacity. Nor do we believe that postponement of installation of one compressor for one year is a justification for the interruptibility feature. Any advantage from the postponement is considerably reduced when the constant increase in costs of construction is considered. The continuous increase in capacity by APSC coupled with the history of non-interruption also raises serious questions concerning the good faith of the interruptibility feature and rate reduction. While interruptibility is a proper contract feature and may be offset by a lower rate, we do not find the five cent rate reduction proposed by APSC justified by interruptibility in the circumstances presently before the court.[50]

■ The third asserted justification accepted by the commission was the need to shift purchases by consumers of natural gas from winter to summer. Our review involves only one determination made by the commission: that the new rates did in fact shift purchase of gas by the city utility from winter to summer. Neither the theoretical desirability of equalizing seasonal usage, nor the fact that demand on APSC is higher in winter than summer is disputed by Jager.

APSC exhibit F before the commission shows that deliveries from APSC to the city increased by 32.3% from the period April through September, 1969, to April through September, 1970, and only 26.6% from October, 1968, through March, 1969, to October, 1969, through March, 1970. Jager countered the APSC exhibit with evidence that city purchases from Eklutna did not respond as expected and in fact increased in the summer months subsequent to adoption of the new rates. Evidence was also introduced showing that the city was unable to purchase any power from Eklutna in winter 1970–71 due to low water. In rebuttal, APSC offered the manager of the city utility who testified that the source of city purchases is determined by a variety of factors and varies daily.

---

48. The superior court was presented data in the form of graphs and tabulated capacity and delivery summaries which covered a lengthy period of time.

49. The superior court was also troubled by the record on interruptibility and opened the record for extensive new testimony. At the conclusion of the hearing, however, the judge ordered the supplemental testimony struck from the record.

50. In its consideration of the interruptibility feature the commission accepted the position urged by APSC that such a feature does not make any capacity increases impermissible but only prohibits such increases when they are of standby capacity. We do not quarrel with the position on interruptibility accepted by the commission.

The commission acknowledged Jager's presentation but gave it little weight because of mathematical errors. We will not disturb that finding. The commission believed that Oliver's testimony also minimized the impact of Jager's assertion. The commission was thus left with the APSC data showing a greater increase in summer purchases as the only data on the record.

The APSC data is, however, also suspect. Both winter periods used occurred substantially prior to imposition of the new rates. Thus, no data on the effect of the new rates on winter sales was in evidence. We also note that in cross-examination Teel admitted that the company had not studied the relative increase in sales for winter and summer months prior to imposition of rate PI and could offer no more than an "impression" that rate PI affected the asserted change in seasonal purchases. We conclude that the asserted justification involving seasonal purchases is not supported by substantial evidence.

The commission determination that proposed rates PI and PPI are reasonable is not supported by substantial evidence on the record as a whole.[51] In several areas the commission decision is based on vague management assertions. The commission failed to demand analytic support for APSC's justifications. In several instances the commission accepted clearly incorrect and irrelevant data. It is necessary to remand the matter to the commission for proper development and analysis of the factual bases for the proposed rates.

Remanded to the superior court with directions to remand to the commission to re-open the hearing for testimony on the issue of discrimination in the rate structure, and further proceedings on the reasonableness of rates PI and PPI consistent with the procedural guidelines set forth in this opinion.

51. Jager argued before the commission that rates PI and PPI were discriminatory as well as unreasonable. He has not pursued the argument that the proposed rates were discriminatory before this court.