**Donald A. GALT and Woodside Construction, Appellants,**

v.

**Maurice F. STANTON, Appellee.**

No. 3520.

Supreme Court of Alaska.

March 2, 1979.
As Modified on Denial of Rehearing
April 6, 1979.

George M. Kapolchok, of Atkinson, Conway, Young, Bell & Gagnon, Anchorage, for appellants.

Jerry Wertzbaugher, Asst. Municipal Atty., Richard Garnett, III, Municipal Atty., Anchorage, for appellant Municipality of Anchorage.

Kelly C. Fisher, of Dickson, Evans, Esch & Papas, Anchorage, for appellee.

OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, and BURKE, JJ., and DIMOND, Senior Justice.

BOOCHEVER, Chief Justice.

This is an appeal from a decision of the superior court remanding for further consideration a decision of the Anchorage City Council sitting as a zoning board of adjustment.[1] The superior court found that there was not substantial evidence to support the City Council's decision. We conclude that there was substantial evidence to support the Council's decision and that the superior court's determination should be reversed.

---

1. The superior court's order remanding for further consideration may not be a final order. The issue has not been raised, and we do not pass on it for the reason that we would, in that event, entertain this matter as a petition for review.

Appellants Donald Galt and Woodside Construction, hereinafter collectively referred to as Galt, are the owners and developers of the Woodside East residential planned unit development in Anchorage.[2] As approved, Woodside East consists of 161 housing units, of which some 109 had been built at the time the present dispute arose. Appellee Maurice Stanton owns a planned unit development (P.U.D.) adjacent to Woodside East and fronting on the intersection of Lake Otis Parkway and Northern Lights Boulevard. As approved, Stanton's P.U.D. consists of three medical office buildings. Presently, access to this P.U.D. is available only from Northern Lights Boulevard and, because of a traffic median on that street, is even further limited to traffic traveling west.[3] Drivers leaving the medical office complex must turn right onto Northern Lights and head west. If they desire to travel east, or to get onto Lake Otis Parkway, they must continue west until they are able to make a legal U-turn in order to head back in the direction from which they came.[4]

In February 1975, Galt petitioned the Planning and Zoning Commission for an extension of time to complete the Woodside East development. The Commission held a public hearing on the petition on March 26, 1975, and at that time, appellee Stanton requested that Galt be required to provide access[5] for the medical office complex through Woodside East to Lake Otis Parkway as a condition of the time extension.[6] Galt opposed the requested condition, arguing that it would open up the residential area to heavy traffic flow from the medical complex. The Planning Commission approved the time extension, but did not resolve the access issue as Stanton had requested. Stanton appealed to the Anchorage City Council, acting in its capacity as the board of adjustment.

On May 13, 1975, the City Council held hearings on the appeal.[7] Unable to resolve the access issue, it tabled the matter and requested that the planning staff of the municipal public works department develop alternative solutions. Five proposals were submitted, and a second hearing was held

2. A planned unit development is defined in GAAB 21.05.020(b)(57) as:
   A group or combination of certain specified residential, commercial or industrial uses developed as a functional and integral unit in a district or districts where some or all of the uses might not otherwise be permitted. Planned unit developments are permitted only by special exception.

3. A diagram of the property is attached to this opinion as Appendix A.

4. Access to both Providence Hospital and Alaska Hospital is via Lake Otis. Doctors renting space in the complex are thus inconvenienced by the limited access.

5. At the hearing, Mr. Stanton's representative referred to "access" to Lake Otis. When asked specifically whether the request was for "an exit only, as opposed to entrance and exit from Lake Otis," he replied: "Exit only is preferable to the present situation . . . ."

6. Under the special exception provisions of GAAB 21.05.060(M), the Planning Commission has the power to impose any "additional conditions to protect the public interest" before granting an exception for a P.U.D.
   As originally platted, what is now the medical office complex was to have been a small neighborhood shopping center which was part of

Woodside East. Access to the shopping center was to be provided for the convenience of Woodside East residents. Preliminary approval was granted for the shopping center with the stipulation that final approval be sought within eighteen months. Final approval for the shopping center was never sought and, instead, Stanton took over the property.
Stanton's first proposal for the medical complex placed the office buildings too close to the residential area, and the Planning Commission ordered that they be moved. Under the modified plans, the buildings were placed in such a way that they blocked the access route provided for in the original plat. The Commission inadvertently approved this detail.

7. Stanton was again asked about the acceptability of an exit-only road:
   Mr. Marsh: . . . If the thing was properly designed so that the traffic could exit only to Lake Otis, wouldn't Mr. Stanton be willing to construct the access as he originally intended to do?
   Mr. Stanton: I certainly would. (unclear). I expected that. I expected to pay for my connector *and if that should be so desired to be curbed so that it was only on [sic: one] way out to Lake Otis, that is fine, no problem.*
   (emphasis added)

before the City Council on May 27. At that time, and after extensive discussion and further testimony, the City Council approved Galt's time extension request, subject to the condition that Galt make available "a fifteen foot strip of land to provide a one-way exit to Lake Otis on the north property line of the medical center." The only objection voiced to the fifteen-foot wide exit road was by the fire chief who wanted access to the area for firefighting equipment. That objection was met by allowing two-way access for emergency vehicles and by making the road twenty-five feet wide—fifteen feet from Galt's property and ten feet from Stanton's. Stanton was not present at this meeting, but Mr. Holmes, his attorney, was, and he did not object to this solution. When asked whether he had a comment, Holmes said:

> I don't think so. I can't speak for Maurice [Stanton] as to whether he wants to accept this. It is a matter of dollars and cents and it is a lot better than what he has got right now. I figure that it is within your prerogative to present him with an alternative and if he wants to buy it fine, but if he doesn't want to buy it at least it releases Don [Galt] and allows him to continue with his subdivision which I think . . .

Under the alternative approved by the City Council, traffic would be able to leave the medical complex, turn right and travel a short distance through Woodside East to Lake Otis Parkway. To keep traffic flow through Woodside East to a minimum, cars would not be able to enter from Lake Otis into Woodside East, and traffic leaving the medical complex would be prohibited from turning left into the residential area.

Stanton appealed to the superior court, requesting that the Council's decision be overturned and that he be given two-way access to Lake Otis. In the alternative, Stanton requested a remand to the City Council for a new hearing. On May 26, 1977, the superior court issued a memorandum decision remanding the case to the City Council for further hearings. The superior court held that the record did not contain enough evidence to determine whether the City Council's decision was reasonable. This appeal by Galt from the superior court decision followed.

The proper standard to be applied by a court reviewing factual determinations of boards of adjustment was laid out in *Keiner v. City of Anchorage*, 378 P.2d 406 (Alaska 1963).[8] In *Keiner*, the superior court was asked to review a decision by the Anchorage City Council acting as a board of adjustment condemning the appellant's building as a fire hazard. The superior court affirmed, and the appellant appealed to this court, claiming that the evidence before the board of adjustment did not support its decision. We held:

> In dealing with this issue we apply the rule that the board's findings should not be reversed if in the light of the whole

8. None of the statutes which govern this appeal specify a standard of review. The statute which provides for appeals from decisions of the board of adjustment is AS 29.33.130:

(a) The assembly shall provide by ordinance for appeals from the board of adjustment to the superior court.

. . . . .

(d) The appeal is heard *upon the record* by the superior court, and the court may reverse or affirm, wholly or partly, the decision appealed from. [emphasis added]

The Anchorage ordinance in effect at the time of the City Council's decision, GAAB 21.30.-390(c), is identical:

The appeal is heard upon the record by the Superior Court and the court may reverse or affirm, wholly or partly, the decision appealed from.

After the Council's decision, at the time of consolidation of the City of Anchorage and the Greater Anchorage Area Borough, a new statute on appeals of zoning decisions went into effect, Anchorage Municipal Code 21.30.190(c), which explicitly provides that findings of planning and zoning commissions and boards of adjustment may be overturned only if, "in the light of the whole record, they are not supported by substantial evidence."

We note that appellee Stanton assumed that the Administrative Procedure Act controls this appeal. It does not. AS 44.62.320(a) lists a series of agencies, boards and administrative bodies specifically subject to the A.P.A. Boards of adjustment are not included on that list. AS 44.62.330(b) specifically limits coverage of the Act to agencies listed or made subject to the Act by other statutes.

record they are supported by substantial evidence, i. e., such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

378 P.2d at 411.[9]

■ In this case, we are dealing, in part, with a question of whether there was substantial evidence upon which the Council could properly base a decision. The Council, however, was also exercising discretion in choosing between alternative plans. Where such discretion has been delegated to an administrative agency,[10] our task is to determine whether there is a rational basis for the exercise of that discretion.[11]

■ Language in the memorandum decision indicates that the superior court was guided by the correct standard of review. The court stated that:

> The central issue in this case is whether there is *substantial evidence* in the record to support the Board's decision as being reasonable. I am unable to say there is.
>
> . . .
>
> I find the record inadequate to determine the *reasonableness* of the decision to limit Medical Park access to Lake Otis Parkway to egress only. [emphasis added][12]

We now turn to whether that standard was applied correctly. The superior court determined that:

> There is not enough evidence of the likelihood that any significant traffic impact upon Woodside East would actually result from permitting two-way access instead of one-way access to support a conclusion that one-way access is reasonable. There is also an absence of evidence concerning whether it would be feasible to permit Medical Park two-way access and at the same time preclude Medical Park traffic from intruding further into Woodside East than necessary to enter the Medical Park.

Upon reviewing the record which that court had before it, we conclude that the superior court erred in deciding that there was not substantial evidence to support the decision of the board of adjustment.

The possibility of a compromise one-way access to the Medical Park P.U.D. was thoroughly considered by the City Council. It was mentioned at the Planning Commission meeting and at the first hearing of the City Council. It was similar to one of the alternatives studied by the planning staff and presented to the Council at the second meeting.

There was ample testimony that full access for the Medical P.U.D. to Lake Otis would generate substantial traffic. At the hearing before the Planning Commission, Galt testified with respect to the present number of cars using the Medical Park complex:

> Security is one of the main things that the Home Owners of Woodside East are

**9.** See *Kelly Supply Co. v. City of Anchorage*, 516 P.2d 1206, 1210–11 (Alaska 1973) (applying substantial evidence test to zoning decision).

**10.** The delegated authority of the Council is to be found in AS 29.33.150.

**11.** 4 K. Davis, Administrative Law Treatise § 30.05 at 214–15 (1958). In *Swindel v. Kelly*, 499 P.2d 291, 298 (Alaska 1972), we stated:
In recent decisions, we have differentiated two types of questions which may confront a court in judicial review of administrative actions. We have long recognized the reviewing court's power to measure the decision by the test of whether "substantial evidence on the whole record" supports it. *Pan American Petroleum Corporation v. Shell Oil Company*, 455 P.2d 12, 20–21 (Alaska 1969); *Keiner v. City of Anchorage*, 378 P.2d 406, 411 (Alaska 1963). But we have also held that in certain areas of agency expertise the appropriate standard on review is whether the agency action had a reasonable basis. *Kelly v. Zamarello*, 486 P.2d 906, 911 (Alaska 1971); *Pan American Petroleum Corporation v. Shell Oil Company*, 455 P.2d at 21–22. [footnote omitted]

**12.** Both parties basically agree that the substantial evidence test is the proper test for reviewing the City Council's decision. Appellant Galt points to language in the trial before the superior court as indicating that the superior court independently weighed and balanced the evidence presented to the City Council. If the superior court substituted its judgment for the City Council's, that would be error. We do not examine in detail whether the superior court in fact used the wrong standard of review since we conclude that, using the correct standard, the City Council's action should be upheld.

worried about right now, and I pointed out earlier, in one of the earlier meetings, that the medical complex houses something like 500 cars a day, and are not related to the Woodside East Home Owners to the P.U.D., and there will be a movement of approximately 500 cars a day out of that development.

One of the residents of Woodside East testified that there had already been an impact on traffic within the residential neighborhood caused by a temporary unpaved access road opening onto Lake Otis from the medical complex. There was also testimony from a representative of the engineering firm that had originally designed Woodside East.

> This driveway was intended and designed only to serve the benefit of the residents of Woodside East and to make it compatible with the commercial center development. It was not intended to be a public drive or public access, for the public to take short cuts between Lake Otis and Northern Lights or from Rogers Park across to the commercial center. . . . We wanted this type of a traffic flow stopped, probably even more than [the residents] did and we attempted very diligently to minimize a traffic pattern that would be conducive to a rapid flow or heavy traffic flow across this project area.
>
> I think that what you have heard tonight implies that if this driveway access to the medical center were now open again, it would, he would be asking for this very

thing to happen, as the minutes in one of your previous meeting indicate a 500-car per day flow out of the medical center onto Lake Otis is more than this subdivision development can stand. It is also an indication if that much traffic were conveniently using this access, it would also be open to numerous other traffic patterns.

At the hearing before the City Council, Galt reiterated his earlier testimony, and added that with the planned addition of two more buildings to the medical complex, traffic could be expected to reach 1,500 cars per day. The representative from the engineering firm also testified again to this effect.

Galt supported a one-way exit as a way to limit the traffic into Woodside East yet grant the Medical P.U.D. some access to Lake Otis. The only objection offered to the one-way exit road was that of the fire chief concerning safety.[13]

The City Council specifically considered an alternative whereby two-way access would be allowed for the Medical P.U.D. with an attempt to limit traffic into Woodside East. This alternative, Alternative #1, had two main drawbacks: it was uncertain how much traffic could be limited, and it would require Galt to replat some of the subdivision.[14] The record contains no evidence or testimony meeting these objections, and a concern expressed at both City Council meetings was that Galt should not have to bear the full brunt of the error in the location of the buildings in the Medical

---

13. During the hearings before the Planning Commission and the City Council, Stanton and his attorney made no objections to an exit road only. Their statements strongly suggest that they viewed an exit road as an acceptable compromise solution. The request for a remand because of insufficient evidence on the record must be viewed in this light. If there is inadequacy, it is of appellee's own making. *See Kelly Supply Co. v. City of Anchorage,* 516 P.2d 1206, 1210–11 (Alaska 1973).

Stanton makes no argument that he did not receive adequate notice about the meeting. In fact, Stanton participated in negotiations with Galt and the Planning Commission staff before the second council meeting and specifically

knew that the alternative of an exit road only would be considered.

14. The Planning Commission's memo to the City Council describing the five alternatives opened with this comment:

> This has been a truly difficult assignment, and we must state categorically that there is no truly satisfactory solution. The problem arose because of errors in the planning process and has been compounded by the conflict between the affected property owners in attempting to protect their respective interest. After "close analysis" of the alternatives, the commission staff supported Alternative #1 but did note the two drawbacks we mention in the text.

P.U.D., something he was in no way responsible for.[15]

Substantial evidence exists under the *Keiner* standard if there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." 378 P.2d at 411. The evidence presented to the City Council was sufficient to meet this standard. A reasonable mind could certainly conclude that one-way access for regular traffic with two-way access for emergency vehicles was an equitable solution to the difficult problem faced by the City Council. It gave the Medical P.U.D. an exit to Lake Otis, it limited the traffic into Woodside East, and it met the safety objection of the fire chief.

■ We conclude that there was substantial evidence upon which the City Council made its decision and that there was also a rational basis for the selection of the particular alternative chosen.

Accordingly, we reverse the decision of the superior court and reinstate the decision of the City Council. Our holding concerning this issue makes it unnecessary to discuss appellants' two remaining specifications of error.[16]

REVERSED.

MATTHEWS, J., not participating.

RABINOWITZ, Justice, concurring.

Although I agree with the court's decision, I am persuaded that the reasonable basis test should not have been utilized in the present case and that, in fact, it is duplicating the function of the substantial evidence test in a confusing manner.

In *Jager v. State*, 537 P.2d 1100, 1107 n.23 (Alaska 1975), we noted the development of four principal standards of review of administrative decisions.

> These are the 'substantial evidence test' for questions of fact; the 'reasonable basis test' for questions of law involving agency expertise; the 'substitution of judgment test' for questions of law where no expertise is involved; and the 'reasonable and not arbitrary test' for review of administrative regulations. [citations omitted]

The substantial evidence test thus clearly is intended to be "employed to review factual determinations made by an agency in the course of its proceedings." *Id.* In contrast, the reasonable basis test, though characterized in *Jager* as applicable to questions of *law* involving agency expertise, has been applied in practice to review complex questions of mixed law and fact incident to the formulation of policy that is within the agency's particular expertise.[1]

The reasonable basis test is utilized by this court whenever the agency is, in effect,

---

**15.** *See* note 6 *supra.*

**16.** Appellants' second specification of error is that the superior court judge improperly considered evidence outside the administrative record by personally and unofficially viewing the property in dispute. The judge indicated in his memorandum opinion that he arrived at his decision "after reviewing the record on appeal and having personally observed the property in question." Under AS 29.33.130(a) and *Keiner v. City of Anchorage*, 378 P.2d 406 (Alaska 1963), the appeal must be heard only upon the record. Accordingly, it would be error for the court to base its decision partially upon its view. If, however, the judge believed that a proper understanding of the record, as opposed to an independent evaluation of the facts, required a view of the premises, it would be proper to make such a view, provided that counsel were advised and offered the opportunity to be present.

Appellants' last argument, that Stanton waived any right to challenge the plat and that the superior court thus had no power to change the plat as recorded, is without merit.

**1.** *See* Alaska *Pub. Util. Comm'n v. Chugach Elec. Ass'n*, 580 P.2d 687, 693–94 (Alaska 1978); *Jager v. State*, 537 P.2d 1100, 1107 (Alaska 1975). *See also* 4 K. Davis, *Administrative Law Treatise* § 30.04, at 213 (1958), which concludes: "[I]t is for us today simply a question of policy as to what matters shall be 'matters of law.' " [*quoting* from Dickerson, *Administrative Justice and the Supremacy of Law* 126–27 (1927). Davis also notes:

> Every determination which defines the meaning of a legal concept is to that extent analytically a determination of law, even though the facts to which the concept is applied are unique and may never again occur.

*Id.* § 30.02, at 195.

making law by creating standards or setting criteria which will be used to evaluate future situations in addition to the individual case before it. An example of this type of agency decision is *Weaver Bros., Inc. v. Alaska Transportation Comm'n* (Alaska 1978), in which the agency's interpretation of the meaning of the term "dormancy" as a criterion in the transfer of a motor carrier permit was judged by the reasonable basis standard of review. A second application of the reasonable basis test is to the merits of an individual petition or cause where the particular rationale may not be broadly applicable to future matters coming before the agency, but the nature of the individual case is such that policy questions involving the agency's area of expertise are paramount to and inseparable from the facts underlying the administrative decision. *See State, Dep't. of Natural Resources v. Universal Education Society, Inc.*, 583 P.2d 806 (Alaska 1978). There we held that the agency's refusal to convert an offshore prospecting permit to a mining lease was properly reviewed under the reasonable basis test because:

It is clear to us that the decision to grant or deny offshore mining leases is within the expertise of the Division of Lands. The decision involves both fundamental policy formulations and complex subject matter. The Division has been entrusted by the legislature with the allocation of lands for offshore mining leases. In making this allocation the Division must make, among others, determinations as to what is the best use of the land, where precisely the land is located, and what method of mining will most efficiently recover the valuable minerals.

*Id.* at 811–12. These two distinct functions of the reasonable basis test are complemented by utilization of the substantial evidence test to review the evidentiary basis for an agency's decision on the merits of an individual case. Though the primary focus of this type of review is on the facts of the particular case before the agency at the time, I recognize that to the extent the agency decides that the facts of a specific case warrant one of a number of possible outcomes, the agency action could be interpreted as making law in the individual matter.[2]

Although our past decisions are not entirely unambiguous, we ordinarily have applied both the substantial evidence and the reasonable basis tests to administrative decisions only where the policy-making or criteria-establishing portions of the administrative decision are clearly separable from the decision on the merits of the individual application.[3] Thus, in *Weaver Bros., Inc. v. Alaska Transportation Comm'n* (Alaska 1978), we found that the agency's interpretation of the term "dormancy" was a matter of policy subject to the reasonable basis standard of review, and further held that there was substantial evidence to support the agency's determination that the individual motor carrier in question met the criteria for non-dormant status. To the contrary, in those cases where the questions of policy have been so intertwined with the facts of the individual application that a distinct policy determination is impracticable, this court has applied only the more deferential reasonable basis standard of review to the overall administrative determination.[4]

2. *See* note 1, *supra.*

3. *See Kelly v. Zamarello*, 486 P.2d 906 (Alaska 1971) (reviewing Commissioner of Natural Resources' determination as to bids on oil and gas leases on reasonable basis grounds and applying the substantial evidence test to the factual aspects of the administrator's findings that the applicants intended that the offer of an added royalty be considered part of the bid itself); *Pan American Petroleum Corp. v. Shell Oil Co.*, 455 P.2d 12 (Alaska 1969) (reviewing the administrative decision on oil lease royalties

based on the director's construction of the term "commercial quantities" on reasonable basis grounds, and ruling that the findings of fact were supported by substantial evidence).

4. *See State, Dep't. of Natural Resources v. Universal Educ. Soc'y, Inc.*, 583 P.2d 806 (Alaska 1978). Other cases in which the reasonable basis test has been found to be appropriate in evaluating an agency decision in an individual case which was based mainly on policy grounds include: *North Slope Bor. v. LeResche*, 581 P.2d 1112 (Alaska 1978) (reviewing the

Though I agree with the application of both the reasonable basis and the substantial evidence tests in the *Weaver Bros.* case, I disagree with the application of both in the present opinion. In my view, the test which was improperly applied here is the reasonable basis test. My difficulty with the reasonable basis test in the present case is simply that I am unable to separate out any law or policy-making function of the agency's decision which is distinct from the specific facts of the case. Thus, when an attempt is made to apply the reasonable basis test to the selection of the particular alternative plan for access to the appellee Stanton's P.U.D. in this case, I conclude that I am applying it to exactly the same facts that the majority evaluates under the substantial evidence test (*i. e.*, whether the decision to provide one-way access is supportable).

Concededly, the determination of whether to apply the substantial evidence as opposed to the reasonable basis test (when one or the other but not both of these standards of review is appropriate) is not free of difficulty. This case is particularly misleading because the board of adjustment was presented several alternative "engineering" solutions to the access problem by its staff. Normally, such a discretionary decision by an administrative agency within its area of expertise triggers a reasonable basis standard of review. However, application of the reasonable basis test to the board's choice in this case carries with it the implication that the agency has "made law" on a question that is unique to the circumstances of the instant case. And when the case at bar is compared to the holdings in other cases where only the substantial evidence test was applied,[5] it becomes clearer that what distinguishes this case from the *Weaver Bros.* and *Universal Education Society* opinions is that, in this case, review of whether the agency has applied appropriate standards or criteria against which to judge the claim of an individual applicant has collapsed into the review of the determination of the facts of the individual case.

Appendix A to follow.

Commissioner of Natural Resources' rejection of the Borough's application to select state lands); *Alaska Pub. Util. Comm'n v. Chugach Elec. Ass'n*, 580 P.2d 687 (Alaska 1978) (review of agency's delineation of electrical service areas for competing utilities); *Jager v. State*, 537 P.2d 1100 (Alaska 1975) (reviewing the Public Utilities Commission's decision not to conduct a rate investigation); *Mobile Oil Corp. v. Local Boundary Comm'n*, 518 P.2d 92 (Alaska 1974) (reviewing agency's decision to incorporate a local self-government unit); *King v. Alaska State Hous. Auth.*, 512 P.2d 887 (Alaska 1973) (reviewing agency's selection of redevelopment proposals); *Swindel v. Kelly*, 499 P.2d 291 (Alaska 1972) (reviewing cancellation of a permit to lease public land).

**5.** So far, the cases which apply the substantial evidence test seem to come mainly from the areas of zoning law and workers' compensation decisions. *See Kelly Supply Co., Inc. v. City of Anchorage*, 516 P.2d 1206 (Alaska. 1973) (review of board of adjustment's refusal to permit a nonconforming use of a building); *Brown v. Northwest Airlines, Inc.*, 444 P.2d 529 (Alaska 1968) (reviewing Workmen's Compensation Board's finding of no residual disability); *Keiner v. City of Anchorage*, 378 P.2d 406 (Alaska 1963) (review of Board of Health's decision that a particular building should be removed as a health and safety hazard). *See also Application of Peterson*, 499 P.2d 304 (Alaska 1972) (review of denial of admission to the state bar).

APPENDIX A

N

1A

This map shows the one-way egress approved by the City Council. Note the traffic medians which require vehicles leaving the Medical PUD to go west on Northern Lights Boulevard and south on Lake Otis Parkway. This map is based on appellants' Exhibit "A" presented to the superior court and a map drawn by the Planning Commission staff which was presented at the City Council's first hearing. It is not drawn to scale.

WOODSIDE EAST
(Appellant Galt's PUD)

Cratagegus

Woodside
East

W

One-way egress
approved by
city council

Bldg 3

MEDICAL PARK
(Appellee Stanton's
PUD)

Bldg 2

median

LAKE OTIS PARKWAY

Bldg 1

Owned by
3rd Person

E

median

Northern Lights Blvd.