Wayne & Donna TARBOX, a Partner-
ship, d/b/a Air Center, Appellant,

v.

STATE of Alaska, ALASKA TRANS-
PORTATION COMMISSION,
Appellee.

No. 7610.

Supreme Court of Alaska.

July 27, 1984.

Steven G. Marks, Baxter, Douglas & Marks, Juneau, for appellant.

G. Charles Schmidt, Jr., Asst. Atty. Gen., Anchorage, Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

## OPINION

Before BURKE, C.J., and RABINO-WITZ, MATTHEWS, COMPTON and MOORE, JJ.

RABINOWITZ, Justice.

### I. *Procedural History*

Wayne and Donna Tarbox, a partnership, doing business as Air Center [hereinafter Center] own and operate a flight training school and aircraft sales business in Juneau, Alaska. In June of 1981, Center filed an application with the Alaska Transportation Commission [hereinafter ATC] to obtain a certificate to operate an air taxi charter service from a base of operations in Juneau. Protest was filed by L.A.B. Flying Service, another flight service, and a hearing was held by the ATC.

Testimony at the hearing revealed the financial structure of Center's proposed air taxi service. Center anticipated that it would use aircraft which it had sold to various purchasers and then leased back (in all instances to the purchasers' tax advantage). Three aircraft owner/lessors testified that under these leasebacks they were required to pay for all necessary maintenance and operation expenses of the aircraft such as insurance, taxes, maintenance and repairs, replacement, inspection, overhauls, depreciation, fuel, oil, and lubricants. Under the leasebacks Center's only obligations were to pay to the lessors an hourly lease rate for aircraft use and to compensate the pilots of the leased aircraft.

Center's application for an air taxi certificate was denied.[1] The ATC found

1. Section AS 02.05.080 of Alaska's Air Commerce Act provides in relevant part:

   *Issuance of certificates.* (a) Subject to the provisions of (d) of this section, the commission shall issue a certificate authorizing the applicant to engage in air commerce as a scheduled or contract carrier or air taxi operator, or authorizing the whole or any part of the operation covered by an application for a certificate,

   (1) if the commission finds that

that Center's proposal was not "economically feasible" and was "contrary to the public interest." Center's subsequent motions for reconsideration and further hearing were denied by the ATC. Center then appealed to the superior court. The issue before the superior court was whether the ATC had a rational basis for its two-fold decision that Center's proposed service was not in the public interest and was not economically feasible. The superior court affirmed the ATC's denial and this appeal followed.[2]

## II. *Discussion*

The ATC denied Center's application for an air taxi certificate on the grounds that:

(A) the applicant is fit, willing and able to engage in air commerce properly and to comply with the provisions of [this chapter] and the regulations of the commission, and
(B) the proposed service is not contrary to the public interest.
(2) ...
(b) ...
(c) If all of the findings required in (a) of this section are not made, then the application shall be denied.
(d) No certificate may be issued to a person to operate as an air carrier unless the applicant submits evidence, satisfactory to the commission, showing that it can and will comply with the provisions of the laws of the United States and the state, and the rules, regulations and orders respecting safety of operation.
(e) ...
(f) A person is fit, willing and able to engage in air commerce if the commission finds that
(1) the proposed service is economically feasible and the applicant has the financial capability to provide it;
. . . .

2. The superior court did not reach the economic feasibility issue, basing its decision solely on public interest grounds:

ATC's finding that the service proposed by Air Center is contrary to the public interest is reasonable when viewed in light of the express policies and purposes of the act. Evidence clearly demonstrates that allowing an applicant to pay non-compensatory rates for leases would discriminate against and eventually destroy existing competition. If, for example, the air carriers were unable to match Air Center's prices, their business would fall off and their profits would be depleted. As a result, services which a commu-

The proposed operation is not shown to be economically feasible within the purview of legislative policy and purposes ... [and]

The proposed operation contravenes the policy and purposes expressed in AS 02.05.010(3) and (4) and is contrary to the public interest.

We cannot ascertain from the ATC's order whether it characterized these two decisions as "Findings of Fact" or "Conclusions of Law". However, our examination of the text of the ATC's order reveals that the primary basis for its determination that Center's proposal was not economically feasible,[3] and contrary to the public interest,[4]

nity had come to expect would be placed in jeopardy or eliminated.

Because the superior court was sitting as an intermediate court of appeal, we review the ATC's findings of fact directly, rather than reviewing the decision of the superior court. *Ketchikan Gateway Borough v. Saling*, 604 P.2d 590, 593 n. 8 (Alaska 1979). Therefore, we discuss both the economic feasibility basis and the public interest basis for the ATC's denial of Center's application.

3. ATC in its regulation 3 AAC 68.041(a) has defined economic feasibility, in part, as follows:

Service is economically feasible if it can reasonably be expected to continue for a substantial period of time. In determining if a proposed service is economically feasible, the commission will, in its discretion, consider the following factors:
(1) the availability and commitment of capital for the initiation and continuing performance of the proposed service;
(2) whether the reasonably expected revenue in relation to the start-up and operating expenses of the proposed service will be adequate to provide safe, adequate, economical, efficient, and continuous service; and
(3) any other relevant factors which indicate that a proposed operation will be economically feasible.

In its order denying Center's application the ATC defined economic feasibility of a proposed new air taxi service as:

the capability of the proposed operation to obtain sufficient local transportation business and revenue to offset the true costs of providing such services, thereby enabling the Applicant to provide a safe and efficient local service to the public for a substantial period of time.

4. AS 02.05.010 provides in part as follows:

was the fact that Center intended to conduct its air taxi service with aircraft leased at non-compensatory rates from various lessors. In this regard the ATC in its decision stated:

> We do not perceive this expressed policy [AS 02.05.010(3) and (4)] as advocating or condoning unbridled competition by an Applicant whose operating costs will, in significant part, be subsidized by other enterprises of the Applicant; or by some other business or individual who leases aircraft to the Applicant at non-compensatory rates to avoid income taxes.
>
> In the instant case, the true costs of the proposed air taxi operation cannot be ascertained from the evidence of record....
>
> The only expense items assigned to the proposed air taxi operation are the pilots' hourly pay for hours actually flown and an aircraft lease rate paid only for hours the aircraft is actually operated in air commerce. The evidence indicates that this lease rate would be substantially non-compensatory to the aircraft owner for operations conducted solely in air taxi charter services.
>
> These arrangements may suit the purposes of the aircraft Lessors and of the Applicant; but they are not the parameters within which economic feasibility is to be judged in terms of Legislative policy or public interest.

■ For purposes of selecting an appropriate standard of review, the ATC's decision is best characterized as a mixed question of law and fact. *See Jager v. State,* 537 P.2d 1100, 1107 (Alaska 1975). The decision involved statutory construction of AS 02.05.010(3) and (4), an evaluation of the relevant evidence regarding Center's proposed financial structure, and an evaluation of the potential impact of Center's proposed operation on the local air carrier industry. The ATC made no effort to separate the legal inquiry from the factual inquiries in its order denying Center's application, and we will not bifurcate our review to reflect those two interwoven elements of the agency's decision. Instead, we approach the ATC's decision as one involving agency expertise as to fundamental policy formulation. *See Kelly v. Zamarello,* 486 P.2d 906, 916–17 (Alaska 1971). As such, the ATC's decision denying Center's application is subject to review by this Court under the "reasonable basis" standard.[5]

■ Under that standard of review, we limit our inquiry to whether the ATC's decision has a reasonable basis in law and in fact. *See, e.g., Alaska Public Utilities Commission v. Chugach Electric Association,* 580 P.2d 687, 694 (Alaska 1978), *overruled on other grounds, City & Borough of Juneau v. Thibodeau,* 595 P.2d 626 (Alaska 1979). While the reasonable basis standard is more deferential than the substitution of judgment standard, the agency's decision must still be "supported by the facts" if it is to withstand review. *Earth Resources Co. of Alaska v. State, Department of Revenue,* 665 P.2d 960, 965 (Alaska 1983). Indeed, in applying the reasonable basis standard of review we have, in some cases, required that the agency's decision have substantial support in the record. *See, e.g., Galt v. Stanton,* 591 P.2d 960, 963–65 (Alaska 1979); *Weaver Bros., Inc. v. Alaska Transportation Commission,* 588 P.2d 819, 823 (Alaska

----

The purpose and policy of this chapter is to

. . . .

(3) promote adequate, economical and efficient service by air carriers, and reasonable charges therefor, without unjust discrimination, undue preferences or advantages, and unfair or destructive competitive practices;

(4) provide for fair and equitable competition through qualified operators who are fit, willing, and able to serve the public with safe, efficient, and continuous air service;

. . . .

5. *Alaska Public Utilities Comm'n v. Chugach Elec. Ass'n.,* 580 P.2d 687, 694 (Alaska 1978), *overruled on other grounds, City & Borough of Juneau v. Thibodeau,* 595 P.2d 626 (Alaska 1979); *Jager v. State,* 537 P.2d 1100, 1107 (Alaska 1975); *Kelly v. Zamarello,* 486 P.2d 906, 916–17 (Alaska 1971). *See also Galt v. Stanton,* 591 P.2d 960, 965 (Alaska 1979) (Rabinowitz, J., concurring).

1978); *Kelly v. Zamarello*, 486 P.2d 906, 918 (Alaska 1971).[6]

We need not decide whether this is an appropriate case in which to require that an agency's determination of a mixed question of law and fact, involving agency expertise as to fundamental policies, must be supported by substantial evidence in the record. Even were we to require only that the ATC's decision have a "reasonable basis in fact," rather than "substantial support in the record," our conclusion would be the same. For our review of the whole record in the instant case discloses an absence of any evidence, let alone substantial evidence, that Center's proposed air taxi operation was not economically feasible within the purview of the Air Commerce Act, or that the proposal was contrary to the public interest as expressed in the Act.

■■■ There is no evidence that the proposed lease arrangement would have a detrimental impact on Center's ability to provide the type of air taxi services contemplated by the Air Commerce Act. Nothing in the record indicates that Center would not be able to provide its air taxi service for a "substantial period of time." 3 AAC 68.041(a). Nor does the record demonstrate that it is an unorthodox business practice for a certified carrier to operate with leased aircraft. On the contrary, the record before us indicates that this method of conducting a business was not atypical within the industry.[7] Thus we hold that there is no evidence to support the ATC's determination that Center's proposed air taxi operation would not be economically feasible, and that this determination, as a consequence, lacked a reasonable basis in fact.[8]

■■■ There is also an absence of evidence for the ATC's further determination that the issuance of an air taxi certificate to Center would not be in the public interest. Insofar as this second determination is based on the fact of Center's contemplated use of leased aircraft, we have already indicated that this practice does not render Center's operation economically unfeasible. There is no evidence in the record to support the ATC's conclusion that the leaseback structure of Center's business would violate the "purpose and policy" provisions of AS 02.05.010(3) and (4).[9] On the record before us, we cannot conclude that Center's innovative financing comprises the kind of "unfair or destructive competitive practices" that AS 02.05.010(3) prohibits. Nor does the record suggest that Center, if certified, would be unable to provide the "safe, efficient and continuous air service" advocated by AS 02.05.010(4). Simply stat-

---

**6.** The Court has not always been in complete agreement as to when it is appropriate to require substantial evidence as part of a "reasonable basis" review. *See, e.g., Galt v. Stanton,* 591 P.2d 960, 966 (Alaska 1979) (Rabinowitz, J., concurring).

**7.** The ATC's new regulations recognize that an applicant's fleet of aircraft may consist of leased craft. In this regard 3 AAC 68.041(b)(1) provides:

(b) Each applicant has the burden to present reasonable proof of its fitness. However, this subsection is directory only, and the evidence may vary from this subsection. The commission, including its staff and hearing officers, may direct that any relevant evidence be filed with the commission. The following provides guidelines for evidence of fitness:

(1) a description of the applicant's current fleet of aircraft and its plans for the purchase or lease of aircraft, including

(A) the number of each make and model of aircraft presently owned or leased and the number of each make and model of aircraft to be purchased or leased;

(B) the applicant's plans for financing the acquisition or lease of additional aircraft; and

(C) a sworn affidavit stating that each aircraft owned or leased has been certified by the FAA and currently complies with FAA safety standards.

. . . .

**8.** According to the dissent, the Commission measures an operation's economic feasibility by its ability to generate sufficient revenue to offset the "true costs" of providing air taxi services. In the absence of evidence that Center's proposed operation would generate inadequate revenue to provide safe, efficient and continuous services, we fail to discern the relevance of Center's "true costs", however the Commission might define that term, to the economic feasibility of Center's proposed operation.

**9.** See note 4, *supra.*

ed, there is no reasonable basis in this record for the ATC's conclusion that Center's intended use of leased aircraft would violate the purposes and policies of the Air Commerce Act. The mere fact that an applicant for a certificate has entered into favorable leasing arrangements, or has obtained favorable financing, does not in and of itself furnish a legal basis for rejection of its application as violative of the public interest.[10]

One further aspect of this appeal remains to be addressed. The superior court upheld the ATC's decision in part on the rationale that it was not unreasonable for the agency to find that Center's proposed operation constituted "skimming".[11] The superior court reasoned that:

> AS 02.05.010(4) further mandates that the public be provided with safe, efficient, and year round service. Because the only evidence of prospective traffic for Air Center is of seasonal demand, it was not unreasonable for ATC to find that the proposed operation constituted skimming. Given that existing carriers run at a loss or close to the margin during the winter, the skimming of their summer profits would diminish their efficiency and place in jeopardy their continued service. It was not unreasonable for the commission to conclude that this is a destructive competitive practice and one which the legislature expressly proscribes.

■ Center argues that the issue of skimming was not raised before the ATC nor did the agency rely upon a skimming rationale in denying Center's application. Review of the agency record shows that skimming was neither raised nor argued as a discrete issue. Additionally, no evidence of skimming appears anywhere in the record. In view of these circumstances we

hold that the superior court's affirmance of the administrative denial of Center's application for a certificate to operate as an air taxi charter service should be reversed and the case remanded to the Alaska Transportation Commission with directions to grant Center's application.

REVERSED and REMANDED.

COMPTON, Justice, dissenting.

This court has frequently stated that cases involving complex subject matter or fundamental policy formulations are the type that require deference to an agency's expertise and, hence, review by the reasonable basis standard. *Hammond v. North Slope Borough*, 645 P.2d 750, 758 (Alaska 1982); *Weaver Bros., Inc. v. Alaska Transportation Commission*, 588 P.2d 819, 821 (Alaska 1978); *Kelly v. Zamarello*, 486 P.2d 906, 917 (Alaska 1971). One of the most important functions the Alaska Transportation Commission performs pursuant to its power to regulate the transportation industry is the certification of carriers. It is difficult to imagine a better example of agency action that requires application of an agency's expertise.

Although the court acknowledges that a reasonable basis standard of review is appropriate here, it has in fact substituted its judgment for that of the agency on every issue. In my view, a fair application of a reasonable basis test would require that we uphold the agency's determination that Center's operations would be economically unfeasible and not in the public interest.

A determination as to whether a given operation is economically feasible or in the public interest requires detailed understanding of the way regulated industries in general, and the transportation industry in particular, function. Similarly, determinations as to the desirability of a business

10. The dissent suggests that the Commission has decided to protect the public interest by insulating existing carriers from price competition. However, the record is devoid of evidence showing that price competition in general, or Center's proposed operation in particular, would in any way reduce the quality of service air travelers in the Juneau area receive.

11. In its brief before this court the ATC defines "skimming" in the following manner:

> The unfair diversion of traffic from existing carriers by one who is not likely to provide long-term service is exactly what skimming is and what the Legislature sought to prevent.

practice or structure in such an industry involve questions of the public interest which are "almost entirely ... policy decision[s]." *Hammond*, 645 P.2d at 758 (Alaska 1982); *see also Weaver Brothers*, 588 P.2d at 821 (Alaska 1978); *cf. Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 293–4, 95 S.Ct. 438, 445–46, 42 L.Ed.2d 447, 460 (1974) (finding that determinations of public convenience and necessity under federal law are judgments entrusted to agency expertise).

The majority attacks the Commission's conclusion that the proposed service would not be economically feasible, citing a lack of evidence that Center would be unable to provide air taxi service for a substantial period of time, or that leasing is an unorthodox business practice. *Tarbox v. State*, 687 P.2d at 920 (Alaska 1984). This approach demonstrates the majority's failure to grasp the basis for the Commission's decision, as set out in its order. An operation is "economically feasible," according to the Commission, when it is capable of generating "sufficient local transportation business and revenue to offset the *true costs* of providing such services." (Emphasis added). Thus, the Commission evaluates feasibility "on the basis of the economics of the air taxi operation standing alone and not as an adjunct to other business ventures in which an applicant may be engaged." This approach, the Commission explains, is responsive to the legislative policy expressed in AS 02.05.010 of providing for "safe, efficient, and continuous air service," AS 02.05.010(4), and promoting "adequate, economical and efficient service by air carriers ... without unjust discriminations, undue preferences or advantages, and unfair or destructive competitive practices; ..." AS 02.05.010(3).

There is no question that the proposed scheme does not reflect the true costs of the air charter operation standing apart from other business ventures of the applicants. The owners of the aircraft are to bear all major costs of operating the planes, in return for *non-compensatory* lease rates and tax advantages. The proposed scheme thus fails totally to satisfy the Commission's definition of economic feasibility.

I believe that both the Commission's interpretation of the term "economically feasible" and its conclusion that the Tarboxes' proposed operation fails to satisfy that definition have a reasonable basis. It is clearly appropriate for the Commission to look at the purposes and policy behind the Alaska Air Commerce Act in interpreting the Act's provisions. Since the principal goal of regulating air carriers is to provide efficient and reliable service, a definition of economic feasibility that seeks to ensure continuity of service has a reasonable basis in law. Further, in view of the same public interest in dependable service, it makes sense to require that an operation's economic feasibility be evaluated in terms of the carrier industry alone, where the factors affecting a carrier's probability of economic success are to some extent known, rather than in terms of other businesses divorced from the industry, the success of which could depend on any number of variables outside the realm of the Commission's expertise.

The majority's discussion of the public interest issue also demonstrates a failure to understand the basis for the Commission's decision. *See Tarbox v. State*, 687 P.2d at 920–921. The Commission's conclusion in that regard is clearly based on the uncontroverted fact that the proposed operation involved *non-compensatory* leasing. There is a reasonable basis for concluding that allowing use of such leases in the air charter industry is contrary to the public interest.

The public's interest, as noted above, is in reliable and continuous service. To that end competition in the air industry is regulated and destructive competitive practices and economically unfeasible operations are prohibited. The public has an interest in continuous service over a substantial period of time from all the operators in the industry, not simply the one applying for authority. Practices that have the poten-

tial for disrupting the service provided by other carriers can be detrimental to the public interest.

There are a number of ways in which the leasing practices described here could have such a deleterious effect. The most obvious is that the lower rates made possible by the use of non-compensatory leasing could allow one participant to drive all the others from a market, only to re-establish prices at a higher level once its competitors have been destroyed. In such an event, the public interest is harmed two ways—by reduction in the number of carriers and, hence, in the amount of competition, and by the disappearance of services on which the public had come to rely.

These concerns are not fully articulated in the Commission's order denying the Tarboxes' application, although to some extent they may be derived from the Commission's attention to its duties to prevent unfair competitive practices and to ensure continuous service. However, it is not necessary to know the precise reasoning behind the Commission's finding that the grant of operating authority in this case would not be in the public interest. "[I]t is sufficient for our purposes to note that there are reasonable bases to support such a [finding]." *Kelly v. Zamarello*, 486 P.2d 906, 918 (Alaska 1971).

Because I believe that the majority improperly substituted its judgment for that of the Alaska Transportation Commission in this matter, and because I conclude that each of the Commission's determinations meets the requirements of the "reasonable basis" test, I dissent from the majority's decision in this case.