*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ALPINE ENERGY, LLC, | ) | |
| | ) | Supreme Court No. S-15696 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-13-06239 CI |
| v. | ) | |
| | ) | O P I N I O N |
| MATANUSKA ELECTRIC | ) | |
| ASSOCIATION and the | ) | No. 7085 – March 4, 2016 |
| REGULATORY COMMISSION OF | ) | |
| ALASKA, | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Michael Spaan, Judge.

Appearances: Robert K. Reiman, Law Offices of Robert K. Reiman, Anchorage, for Appellant. David J. Mayberry, Crowell & Moring, LLP, Anchorage, for Appellee Matanuska Electric Association, Stuart W. Goering and Emma K. Pokon, Assistant Attorneys General, Anchorage, and Craig W. Richards, Attorney General, Juneau, for Appellee Regulatory Commission of Alaska.

Before: Stowers, Chief Justice, Fabe, and Bolger, Justices. [Winfree and Maassen, Justices, not participating.]

BOLGER, Justice.

# I. INTRODUCTION

Federal law requires electric utilities to purchase power generated by cogeneration facilities that meet certain standards and provides a method of calculating the purchase rate that the utilities must pay. To qualify for this treatment, a facility must be certified that it meets the standards. It may self-certify, by filing a form describing the project and asserting that it believes it meets the standards, or it may request a formal determination that it meets the standards. The Regulatory Commission of Alaska implements this certification scheme on the state level, but the determination whether a facility qualifies falls within exclusive federal jurisdiction.

The main issue presented in this appeal is whether a self-certification constitutes a federal determination that a facility meets the standards and whether the Commission must defer to this self-certification. We conclude that a self-certification does not constitute a federal determination and that the Commission's broad discretion to implement the federal scheme means it has the power to require a developer to formally certify its projects.

# II. FACTS AND PROCEEDINGS

## A. Regulatory Background

Congress enacted the Public Utility Regulatory Policies Act (PURPA) in 1978 to increase conservation of energy, make electric utilities more efficient, and encourage equitable rates for electric customers.[1] Section 210 of PURPA[2] seeks to accomplish this by "encourag[ing] the development of cogeneration and small power

---

[1]     *See* Public Utility Regulatory Policies Act of 1978 (PURPA), Pub. L. No. 95-617, § 2, 92 Stat. 3117 (1978) (codified at 16 U.S.C. § 2601 (2012)); *FERC v. Mississippi*, 456 U.S. 742, 746 (1982).

[2]     PURPA § 210 (codified as amended at 16 U.S.C. § 824a-3).

production facilities."[3] Cogeneration facilities produce electric energy along with some other types of useful energy, such as heat.[4] PURPA encourages development of these facilities by requiring electric utilities to purchase electric energy from and sell electric energy to "qualifying" cogeneration and small power production facilities,[5] and by exempting these qualifying facilities from state and federal regulation as utilities.[6]

PURPA charges the Federal Energy Regulatory Commission (FERC) with implementation,[7] and directs state regulatory authorities to implement FERC's rules in turn.[8]    In Alaska, this task falls to the Regulatory Commission of Alaska (the Commission).[9]

Under FERC's regulations implementing PURPA, "qualifying facilities" are facilities that both meet certain efficiency, operating, and use standards, and are certified.[10] Facilities can become certified in two different ways: They may file a notice of self-certification with FERC, asserting that they meet the relevant standards, or they

---

[3]    *FERC*, 456 U.S. at 750.

[4]    16 U.S.C. § 796(18)(A).

[5]    *Id*. § 824a-3(a).

[6]    *Id*. § 824a-3(e).

[7]    *Id*. § 824a-3(a).

[8]    *See id*. § 824a-3(f).

[9]    16 U.S.C. § 796(15), (21) (defining "[s]tate regulatory authority" as the regulatory body with jurisdiction over "rates and charges for the sale of electric energy to consumers"); AS 42.05.141 (granting the Regulatory Commission of Alaska authority to regulate public utilities and their rates and charges).

[10]    18 C.F.R. § 292.203(b) (2015).

may apply to FERC for certification.[11]  If a certified facility is "substantial[ly] alter[ed] or modifi[ed]," it must recertify.[12]  Self-certification is free,[13] while formal certification carries a filing fee of $24,070 for cogeneration facilities.[14]  Other parties may challenge a self-certified or formally certified facility's qualifying-facility status;[15] a challenge carries a filing fee of $24,370.[16]

FERC's regulations implementing PURPA also control the rates that utilities must pay qualifying facilities for energy. Purchase rates must not exceed the utility's "avoided costs,"[17] which are "the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility . . . , such utility would generate itself or purchase from another source."[18]  In other words, the utility is obligated to purchase a qualifying facility's energy, but it is not obligated to pay any more for that energy than it would have paid if it obtained the energy from a different source.

---

[11]    *Id*. § 292.207. The parties and the superior court all refer to this process as "formal certification."  We adopt this terminology.

[12]    *Id*. § 292.207(d)(2).

[13]    *Id*. § 292.207(a).

[14]    *Id*. § 381.505(a).

[15]    *Id*. § 292.207(d).

[16]    Revisions to Form, Procedures and Criteria for Certification of Qualifying Facility Status, 75 Fed. Reg. 15,950, 15,951 n.15 (Mar. 30, 2010) ("A motion seeking revocation requires a filing fee as a declaratory order."); 18 C.F.R. § 381.302(a) (listing the fee for filing declaratory order to challenge the certification).

[17]    18 C.F.R. § 292.304(a)-(b); *see also* 16 U.S.C. § 824a-3(b) (2012).

[18]    18 C.F.R. § 292.101(b)(6).

Because potential qualifying facilities and investors need to predict purchase rates to be able to estimate the return on a potential investment, FERC's regulations require utilities to "make available data from which avoided costs may be derived."[19] These data are not the same as a purchase rate; rather, they are "the first step in the determination of such a rate."[20]

## B. Facts

In May 2008, Alpine Energy self-certified five proposed cogeneration facilities. Only two of these facilities are at issue in this case: Pioneer Energy #1, later renamed "Goose Creek Energy Project," and Pioneer Energy #4, later renamed "Pioneer Energy Project." Alpine anticipated selling the thermal energy from Pioneer Energy #1 to local businesses, residences, and greenhouses for the purpose of space heating. It intended to sell the thermal energy from Pioneer Energy #4 to the Alaska State Fair and to various commercial customers and greenhouses, again for the purpose of space heating.

Shortly after filing the notices of self-certification, Alpine requested the local electric utility, Matanuska Energy Association (MEA), to interconnect with its facilities — that is, to physically connect the cogeneration facilities with MEA's utility network to facilitate the purchase of electric energy.[21] Alpine also requested MEA to provide certain avoided-cost information required by the Commission's regulations, and to open good-faith negotiations for the purchase of power from Alpine's facilities.

---

[19] *Id*. § 292.302(b).

[20] Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of PURPA, 45 Fed. Reg. 12,214, 12,218 (Feb. 25, 1980).

[21] *See* 18 C.F.R. § 292.101(b)(7) (defining "[i]nterconnection costs" as "the reasonable costs . . . directly related to the installation and maintenance of the physical facilities necessary to permit interconnected operations with a qualifying facility").

Under Alaska regulations, a qualifying facility's request for interconnection triggers a 60-day period within which the utility must provide the qualifying facility with a tariff setting out rates for interconnection, purchases, and sales.[22]  Accordingly, in its reply to Alpine, MEA requested certain engineering information from Alpine that it stated was necessary to determine the costs of interconnection.  MEA also stated that the avoided-cost information Alpine had requested was available in its then-effective tariff, on file with the Commission.

Alpine did not provide the requested engineering information in its response.  Instead, Alpine reiterated its request to enter negotiations for the purchase of energy.  As a result, MEA filed a petition with the Commission requesting a waiver of the 60-day period.  Alpine did not oppose the petition, and the Commission granted the waiver, suspending MEA's obligations under 3 AAC 50.790(b) "until at such time as it voluntarily provides the interconnection to [Alpine] or until in a future order, in response to a filing by [Alpine] or otherwise, we revoke the waiver, whichever first occurs."

Alpine and MEA continued to correspond about negotiating power purchase agreements.   The discussions focused on two of the projects that Alpine had initially proposed:  Pioneer Energy #4, to be sited at the Alaska State Fair, and the Goose Creek Energy Project (formerly Pioneer Energy #1), intended to provide heat and electric energy for the Goose Creek Correctional Facility.[23]

At the outset, MEA expressed doubts about the qualifying-facility status of Alpine's projects and about Alpine's ability to successfully develop them.   MEA specifically mentioned Alpine's history of proposing cogeneration projects without

---

[22]    3 Alaska Administrative Code (AAC) 50.790(b) (2015).

[23]    The record does not show when Alpine began planning a project at Goose Creek.  None of its initial self-certifications describe such a project.  From this point on, though, this project is clearly a subject of negotiations with MEA.

commitments for the purchase of thermal energy. The parties disputed the projects' qualifying-facility status for several months. In May 2009, however, Alpine provided MEA with letters of interest from two potential thermal energy customers, or thermal hosts — the Alaska State Fair and the Department of Corrections. MEA subsequently agreed to begin negotiations with Alpine for the purchase of electric energy.

Alpine sent MEA a draft power purchase agreement for the Goose Creek project in June 2010, but the parties did not negotiate the terms of the agreement. Instead, in August 2010, Alpine and MEA entered into "Precedent Agreements" for the projects at issue here. Under these agreements, negotiations were halted, and Alpine was required to meet certain conditions before negotiations would resume. The agreements required Alpine to obtain binding contractual commitments for the sale of the thermal energy that its proposed projects would produce, receive commitments for all financing necessary to construct and operate the projects, and obtain all permits, authorizations, and rights needed to construct and operate the projects. If Alpine met the conditions by December 31, 2011, the parties agreed to negotiate power purchase agreements. If Alpine did not meet the conditions by that date, the agreements would terminate.

While it was communicating with Alpine, MEA was also planning its own power generation project, the Eklutna Generation Station. It put out a Request for Proposals in October 2009, seeking contractors for the project. And in March 2011, MEA signed a contract committing to the first stage of the project.

In December 2011, Alpine self-recertified the Pioneer and Goose Creek projects, and again requested interconnection from MEA. The recertifications stated that both projects would sell the bulk of their thermal energy to Mat-Su Produce. According

to Alpine, Mat-Su Produce was to be an Alpine subsidiary that operated greenhouses.[24] The Pioneer project would sell the remainder of its thermal energy to the Alaska State Fair, the City of Palmer, Matanuska-Susitna Borough Schools, and other commercial customers, and the Goose Creek project would sell the remainder of its energy to Valley Utilities and other commercial customers.

At the same time that it self-recertified, Alpine also informed MEA that the conditions of the precedent agreements had been met and requested to begin negotiating power purchase agreements. Along with its request, Alpine provided MEA with copies of agreements with potential thermal hosts and with copies of agreements with broker-dealer FirstSouthwest for debt placement services. MEA responded that it did not believe the conditions were met; in particular, it noted that Alpine had obtained no financing commitments and had not obtained Commission authorization for either project. On January 9, 2012, MEA informed Alpine that it considered the precedent agreements terminated because Alpine had failed to meet the conditions precedent by the deadline.

---

[24] Mat-Su Produce was not registered to do business in Alaska by the time of the administrative proceedings, and still is not. *Search Business License Database*, DEP'T OF COMMERCE, CMTY., & ECON. DEV., https://www.commerce.alaska.gov /cbp/MAIN/CBPLSearch.aspx?mode=Bl (showing no search results when searching "Business Name" for "Mat-Su Produce" and "Mat Su Produce") (last visited Feb. 16, 2016).

## C. Proceedings

### 1. Administrative proceedings

On February 13, 2012, Alpine filed a formal complaint with the Commission,[25] asserting that MEA had failed to comply with its obligations under PURPA and its implementing regulations. Alpine requested relief in the form of (1) an order for MEA to provide the avoided-cost information required by 3 AAC 50.790(d), including the data and methodology used to derive those costs; (2) a declaratory order that MEA may not refuse to negotiate with Alpine based on doubts as to the validity of its projects' qualifying-facility status; (3) an order for MEA to enter into negotiations to purchase power from Alpine's facilities; (4) an order for MEA to set the rates for those purchases based on its avoided costs at the time Alpine initially requested interconnection; and (5) an order that those avoided costs should include the costs of the Eklutna Generation Station, or in the alternative an order enjoining MEA from incurring any additional expenses to add capacity.

MEA denied the allegations in the formal complaint and moved to dismiss. It challenged Alpine's claim that it had met the terms of the precedent agreements, pointing out that Alpine's agreements with thermal hosts were expressly contingent on the negotiation of a power purchase agreement, and were therefore not binding as required by the precedent agreements. It also highlighted the highly speculative nature of both projects' primary thermal host, Mat-Su Produce. And it pointed out that FirstSouthwest had not agreed to finance Alpine's projects; instead, it had agreed to act as a placement agent for any bonds issued by Alpine or its projects, but left it up to Alpine to actually issue such bonds or obtain other financing.

---

[25] *See* 3 AAC 48.130 (listing the Commission's procedures for filing and investigating formal complaints).

Accordingly, MEA argued, the Commission should require Alpine to formally certify its projects as qualifying facilities before enforcing rights dependent on their qualifying-facility status. MEA asserted that Alpine's failure to meet the precedent agreements, and the facts underlying its failure, raised legitimate questions about its projects' qualifying-facility status, which should be resolved by FERC in the formal certification process. MEA also claimed it had already provided Alpine with the required avoided-cost information, and that the Commission's waiver of its obligation to provide the information required by 3 AAC 50.790(b) was still valid.

The Commission dismissed Alpine's claim in part on July 20, 2012. It found no good cause to investigate[26] Alpine's claim of entitlement to a tariff under 3 AAC 50.790(b) because its earlier waiver of that requirement had not been rescinded. The Commission also determined that it did have the authority to require Alpine to obtain formal certification if there was a legitimate claim that the merits of a qualifying facility's self-certification were questionable. It decided that MEA asserted such a legitimate claim here, and dismissed without prejudice Alpine's claims that depended on its projects' qualifying-facility status, instructing Alpine that it could refile its claims after obtaining formal certification.

The Commission did, however, find good cause to investigate whether MEA was in compliance with the information-publication requirements of 3 AAC 50.790(d). MEA had provided only an average of its avoided costs over the next five years, instead of a year-by-year projection as required. The Commission also expressed concern that MEA's avoided-cost calculations did not consider any part of its recent Eklutna Generation Station project avoidable, although MEA had committed to

---

[26]    *See* 3 AAC 48.130(f) ("A formal investigation will not be instituted on complaint, except for good cause shown to the [C]ommission's satisfaction by the complainant.").

the project only after its communications with Alpine. Finally, the Commission noted that it was unclear whether MEA actually "maintained" the information as required, or simply generated it upon request.

On August 23, 2012, MEA filed a Notice of Compliance, informing the Commission that it had made publicly available all information required by 3 AAC 50.790(d).

The parties both moved for summary judgment on this remaining issue. Alpine argued that it was entitled to the avoided-cost information as of May 2008, the time of its initial request for interconnection. In particular, Alpine focused on the cost of the Eklutna Generation Station, which MEA had not yet committed to build when Alpine originally requested interconnection. If MEA had agreed to purchase energy from Alpine at that time, Alpine argued, MEA would not have had to build as much additional capacity. Alpine claimed that the costs incurred to build that additional capacity were therefore avoidable, and should be included in the purchase rates for Alpine's electric energy. Alpine also argued that 3 AAC 50.790(d) required MEA to provide the data and methodology underlying its avoided-cost information, and that MEA had not done so.

In MEA's motion for summary judgment, it directed the Commission to the information it had made available in August 2012, in accordance with its Notice of Compliance. MEA claimed that this information was in compliance with 3 AAC 50.790(d), and that the regulation did not require it to make public the underlying data and methodology. It acknowledged, however, that it had not published this information prior to August 23, 2012, instead providing it only upon request. It denied that the Eklutna Generation Station was an avoidable cost, or that Alpine was entitled to a purchase rate based on historic avoided costs. It also pointed out that the Commission had already decided that Alpine must obtain formal certification for its projects before

they were entitled to *any* purchase rate, and that the historic avoided-costs issue was therefore outside of the scope of the proceedings.

The Commission agreed with MEA that the only remaining issue was whether MEA's publicly available information was currently in compliance with 3 AAC 50.790(d). It found that MEA was fully in compliance, and that it did not need to supply the data and methodology underlying its avoided-cost calculations. Accordingly, the Commission denied Alpine's motion for summary judgment, granted MEA's cross-motion for summary judgment, and closed the docket.

### 2. Superior court proceedings

Alpine appealed the Commission's decision to the superior court. Alpine argued that the Commission lacked the power to require it to formally certify its projects before requiring MEA to treat the projects as qualifying facilities. Instead, Alpine claimed, the Commission should have required MEA to provide a specific tariff for each of Alpine's projects, and to purchase electric energy from these projects at a rate based on the avoided costs at the time it filed the Formal Complaint.[27] Even if the Commission was authorized to require formal certification, Alpine argued, it should have held an evidentiary hearing before doing so. Alpine also reiterated its arguments that the Commission's regulations require utilities to publish a general qualifying facility tariff and to provide the data and methodology underlying their publicly available avoided-cost information.

The superior court affirmed the Commission in full. It found that the Commission interpreted its own regulations reasonably in finding it had the authority to

---

[27] Alpine had argued before the Commission that it was entitled to a rate based on the avoided costs as of May 2008, when it first requested interconnection. In the superior court, and in the present appeal, it argues instead that it is entitled to a rate based on the avoided costs "no later than the filing of the Formal Complaint."

require formal certification, and that it properly exercised such authority here. It found that no evidentiary hearing was necessary because the Commission simply determined, based on the facts alleged by Alpine, that no good cause existed to open an investigation. And it found that the Commission reasonably interpreted its regulations to contain no general tariff or data-and-methodology requirement. Alpine now appeals.

## III. STANDARD OF REVIEW

"In an administrative appeal we independently review the merits of the agency's decision."[28] We apply the "reasonable basis" test to the Commission's decision not to conduct an investigation.[29] Under the deferential "reasonable basis" test, we consider whether the agency's decision was "arbitrary, capricious, or unreasonable,"[30] and whether the agency "[took] a hard look at the salient problems and . . . genuinely engaged in reasoned decision making."[31]

"We review an agency's interpretation of its own regulations under the reasonable and not arbitrary standard"[32] when the agency's interpretation "implicate[s] special agency expertise or the determination of fundamental policies within the scope

---

[28]    *Luper v. City of Wasilla*, 215 P.3d 342, 345 (Alaska 2009) (citing *Griswold v. City of Homer*, 55 P.3d 64, 68 (Alaska 2002); *Balough v. Fairbanks N. Star Borough*, 995 P.2d 245, 254 (Alaska 2000)).

[29]    *Jager v. State*, 537 P.2d 1100, 1107 (Alaska 1975).

[30]    *Denali Citizens Council v. State, Dep't of Nat. Res.*, 318 P.3d 380, 385 (Alaska 2014) (quoting *Ninilchik Traditional Council v. Noah*, 928 P.2d 1206, 1213 (Alaska 1996)).

[31]    *Id.* (quoting *Kachemak Bay Conservation Soc'y v. State, Dep't of Nat. Res.*, 6 P.3d 270, 275 (Alaska 2000)).

[32]    *Stosh's I/M v. Fairbanks N. Star Borough*, 12 P.3d 1180, 1183 (Alaska 2000) (citing *Handley v. State*, 838 P.2d 1231, 1233 (Alaska 1992)).

of the agency's statutory function."[33] This "deferential standard of review properly recognizes that the agency is best able to discern its intent in promulgating the regulation at issue."[34] "We will affirm the agency's interpretation under this deferential standard if the agency's interpretation is a reasonable one."[35]

However, "[t]he 'substitution of judgment' test is the appropriate standard for interpreting regulations . . . when the agency interpretation does not concern administrative expertise as to either complex subject matter or fundamental policy."[36] Questions of statutory interpretation are also reviewed under the "substitution of judgment" test unless the agency's "interpretation of law turns on its technical expertise or 'the determination of fundamental policies within the scope of [its] statutory function.' "[37]

## IV. DISCUSSION

### A. The Commission May Require Alpine To Formally Certify Its Projects.

#### 1. Federal law does not prohibit the Commission from requiring formal certification.

---

[33] *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987).

[34] *Stosh's I/M*, 12 P.3d at 1183 (quoting *Rose v. Commercial Fisheries Entry Comm'n*, 647 P.2d 154, 161 (Alaska 1982)).

[35] *Anderson v. State, Dep't of Revenue*, 26 P.3d 1106, 1109 (Alaska 2001) (citing *Handley*, 838 P.2d at 1233).

[36] *Borkowski v. Snowden*, 665 P.2d 22, 25 (Alaska 1983) (citing *Rose*, 647 P.2d at 161).

[37] *W. States Fire Protection Co. v. Municipality of Anchorage*, 146 P.3d 986, 989 (Alaska 2006) (quoting *Tesoro*, 746 P.2d at 903).

Alpine argues that FERC has exclusive jurisdiction to determine qualifying-facility status, and that it has done so here by accepting the self-certifications. It claims that the Commission must therefore defer to this determination and accept Alpine's self-certifications as conclusive evidence of the projects' qualifying-facility status.

Neither Congress nor FERC has directly addressed this issue. PURPA itself simply sets standards for qualifying facilities[38] and delegates implementation to FERC.[39] FERC's regulations set up the certification system, but do not specify whether state regulators and others must treat self-certification as conclusive evidence of qualifying-facility status, or if they must give any deference at all to a self-certification.[40] FERC has suggested in its orders that state regulators may require formal certification, but it has never expressly ruled on this point.[41]

It is clear, however, that FERC granted states significant discretion in implementing and enforcing its regulations. FERC's regulations implementing section 210 of PURPA "afford the State regulatory authorities . . . great latitude in determining the manner of implementation of [FERC's] rules, provided that the manner chosen is

---

[38]    16 U.S.C. § 796(18)(B) (2012).

[39]    *Id.* § 824a-3(n).

[40]    18 C.F.R. §§ 292.203, .205, .207 (2015).

[41]    *See Chugach Elec. Ass'n*, 121 FERC 61,287 ¶ 21 (2007) ("[T]here [are] reasons that a [qualifying facility] may want or need [formal] certification (including the requirement of some lenders, utilities, or state regulators that a generator seeking [qualifying facility] status and the benefits of PURPA be [formally] certified) . . . ."); Revisions to Form, Procedures, and Criteria for Certification of Qualifying Facility Status, 75 Fed. Reg. 15,950, 15,951 (Mar. 30, 2010).

reasonably designed to implement the requirements of Subpart C."[42] Subpart C regulates sales and purchases between qualifying facilities and utilities,[43] and includes the obligation for utilities to purchase energy from qualifying facilities.[44] FERC specifically contemplates state implementation by regulation as well as by case-by-case dispute resolution.[45]

It is also clear that FERC has exclusive jurisdiction over determinations of qualifying-facility status and that states may not make such determinations. In *Independent Energy Producers Ass'n v. California Public Utilities Commission*, the Court of Appeals for the Ninth Circuit invalidated a California regulatory scheme that permitted utilities to unilaterally decide that qualifying facilities with whom they contracted, including formally certified qualifying facilities, no longer met the federal operating and efficiency standards.[46] The state regulations permitted utilities to reduce the purchase rates for those facilities by 20% instead of paying the full avoided-cost rate to which they would otherwise be entitled.[47] The court invalidated the scheme, holding

---

[42]     Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of PURPA, 45 Fed. Reg. 12,214, 12,230-31 (Feb. 25, 1980).

[43]     18 C.F.R. § 292.301(a).

[44]     *Id*. § 292.303(a).

[45]     Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of PURPA, 45 Fed. Reg. at 12,231; *FERC v. Mississippi*, 456 U.S. 742, 751 (1982).

[46]     36 F.3d 848, 858 (9th Cir. 1994).

[47]     *Id*. at 852.

that PURPA required a federal decision maker applying uniform standards for all determinations of qualifying-facility status.[48]

Alpine claims that its self-certifications mean that FERC has already determined its projects' qualifying-facility status and that the Commission impermissibly disregarded that determination and made a determination of its own. We must therefore decide whether self-certifications constitute determinations of qualifying-facility status by FERC, or whether the Commission's decision not to enforce Alpine's asserted PURPA rights at this time is itself an impermissible determination of qualifying-facility status.

Self-certification alone does not create a qualifying facility; under FERC's regulations, a cogeneration facility is a qualifying facility only if it meets certain standards *and* is certified, either by self-certification or formal certification.[49] FERC does not formally review self-certifications; rather it examines the filing "to determine that the self-certifier has provided the information required by the regulations," but it does not check the accuracy of that information or determine whether the information provided, if accurate, demonstrates qualifying-facility status.[50] And when FERC accepts notices of self-certification from project owners, it specifically informs the owner that "[a]cceptance for filing does not constitute approval of any application or self-certifying notice."

Alpine's assertion that FERC determined that "its projects as described [in its self-certifications] were valid [q]ualifying [f]acilities" is therefore incorrect. *Alpine*

---

[48]    *Id*. at 854.

[49]    18 C.F.R. § 292.203(b).

[50]    Revisions to Form, Procedures, and Criteria for Certification of Qualifying Facility Status, 75 Fed. Reg. 15,950, 15,951 (Mar. 30, 2010).

made that determination; FERC simply verified that Alpine filled out the self-certification form correctly.  FERC has also made clear in a different context that "no [FERC] determination or approval attaches to a self-certification" because "no [FERC] action is required or even contemplated."[51]

Self-certifications are therefore not determinations of qualifying-facility status within the meaning of *Independent Energy Producers*.  The court in that case relied on PURPA's definition of a qualifying facility as a facility that "[*FERC*] determines, by rule, meets such requirements . . . as [*FERC*] may, by rule, prescribe."[52] It also highlighted a passage from PURPA's legislative history stating that qualifying facilities were to be "identified *through* [*FERC*] *action*."[53]  But as FERC has expressly stated, it takes no action on self-certifications, and it does not determine whether a self-certified facility meets the substantive requirements.

Nor did the Commission make any determination of its own here.  Instead, it recognized that no determination has yet been made and that a determination from FERC will likely be needed to settle the dispute between the parties.  The Commission did refer to the standards for qualifying-facility status, but it did not determine whether Alpine's projects met those standards; instead, it assessed the likelihood that FERC

---

**51**   *Chugach Elec. Ass'n*, 121 FERC 61,287 ¶¶ 53-54 (2007) (explaining why no filing fees attach to a self-certification); *see also id.* at ¶ 31 ("[FERC] staff's not issuing a deficiency letter to a self-certified facility does not constitute a finding as to any matter contained in such a self-certification.").

**52**   *Indep. Energy Producers*, 36 F.3d at 854 (omission in original) (quoting 16 U.S.C. § 796(18)(B)(I) (2012) (emphasis added)).

**53**   *Id*. (quoting H.R. Conf. Rep. No. 1750 at 89, *reprinted in* 1978 U.S.C.C.A.N. 7659, 7797, 7823 (1978) (emphasis added)).

would consider the projects qualifying facilities, and on that basis, allocated the cost of obtaining a FERC determination to Alpine.

Neither FERC nor the Commission has determined the qualifying-facility status of Alpine's projects, and federal law does not otherwise prohibit the Commission from requiring self-certified qualifying facilities to formally certify. This authority falls well within the Commission's "great latitude" to implement PURPA's power purchase requirements.[54] As a result, the Commission need not defer to Alpine's self-certifications and has the authority to require Alpine to obtain formal certification of its projects from FERC before requiring MEA to treat them as qualifying facilities.[55]

### 2. It was reasonable for the Commission to require formal certification here.

The Commission determined that "legitimate concerns" about Alpine's projects' qualifying-facility status exist and that therefore no good cause existed to open an investigation, based on three factors: (1) the lack of commitments from thermal hosts and the conditional nature of agreements with potential thermal hosts; (2) the lack of infrastructure to deliver thermal energy; and (3) "the speculative nature of Alpine['s] . . . largest host, Mat-Su Produce."

Alpine argues that the Commission's conclusion was unreasonable, but it does not actually address any of the bases for the Commission's decision. Instead, it argues that these circumstances came to pass only because of MEA's failure to provide avoided-cost information, which made it impossible to "firm up the financing and

---

[54] Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of PURPA, 45 Fed. Reg. 12,214, 12,230. (Feb. 25, 1980).

[55] Alpine argued before the superior court that the Commission incorrectly interpreted its own regulations to permit requiring formal certification. It did not raise this argument in this appeal, so we treat it as waived and do not address it.

contractual commitments necessary to proceed" with developing the projects. Alpine also argues that the standard applied by the Commission — "legitimate concerns" regarding qualifying-facility status — was unreasonable.

Alpine first argues that MEA thwarted the development of its projects by failing to provide the required avoided-cost information and that, as a remedy, MEA should be compelled to treat Alpine's projects as qualifying facilities. Instead, the Commission decided to enforce the avoided-cost disclosure requirement only prospectively.[56] Although the Commission did not explain why it made this choice, Alpine does not argue that its proposed remedy was the Commission's only option. The Commission could reasonably have decided that the potential cost to ratepayers of forcing MEA to contract with Alpine before it received formal certification outweighed any benefit.

Whatever the reasons for the speculative nature of Alpine's projects, the Commission's actual concerns about the projects were reasonable. Alpine produced agreements with two thermal hosts, but those agreements were conditioned on Alpine contracting with MEA for the sale of electric energy. There is no evidence that Alpine had obtained any commitments, even conditional ones, from its other potential thermal hosts, and many of these hosts were the same as or similar to proposed hosts for prior decertified projects. In addition, there was no existing infrastructure to deliver thermal energy to customers. And there is no evidence that the largest proposed thermal host, Mat-Su Produce, had any plans to do business in Alaska.

---

[56] FERC does impose penalties on utilities for failure to provide the avoided-cost information required by 18 C.F.R. § 292.302, which 3 AAC 50.790(d) mirrors. *See* 18 C.F.R. §§ 292.302, 292.401 (2015). Alpine did not seek this remedy in the proceedings before the Commission.

In 2007, FERC decertified two proposed projects very similar to those that Alpine now proposes.[57]  In its order, FERC found that the project developer "simply ha[d] not provided sufficient basis for [FERC] to conclude that the thermal uses . . . will materialize."[58]  It declined to "assume that [the developer's] optimistic projections will come true,"[59] and noted that the proposed thermal hosts, as well as the infrastructure required to actually provide thermal energy, did not exist in Southcentral Alaska.[60]  As a result, it could not conclude that the thermal energy would be put to a "productive and beneficial purpose,"[61] or that the projects had any purpose other than selling electric energy to a utility.[62]

Alpine's projects share these characteristics.  There was still no infrastructure in place in the region to provide thermal energy, its projects had no firm thermal hosts, and the largest proposed thermal host — Mat-Su Produce — did not yet exist.[63]  Although there are differences — for example, most of the decertified projects'

---

[57]     *Chugach Elec. Ass'n*, 121 FERC 61,287 (2007).

[58]     *Id*. at ¶ 39.

[59]     *Id*. at ¶ 40.

[60]     *Id*. at ¶ 39.

[61]     *Id*. at ¶ 40.

[62]     *Id*. at ¶ 46.

[63]     *See Search Business License Database*, DEP'T OF COMMERCE, CMTY., & ECON. DEV., https://www.commerce.alaska.gov/cbp/MAIN/CBPLSearch.aspx?mode=Bl (showing no search results when searching "Business Name" for "Mat-Su Produce" and "Mat Su Produce") (last visited Feb. 16, 2016).

thermal hosts were unnamed,[64] while Alpine did identify most of its projects' hosts —
it was reasonable for the Commission to conclude that the similarities raised legitimate
concerns that Alpine's projects would not meet the qualifying facility standards.

Finally, Alpine contests the standard applied by the Commission — that if
"legitimate concerns" exist about the projects' qualifying-facility status, there is no good
cause to open an investigation. It argues that this standard requires Alpine to "establish
that the presently recognized validity of its projects cannot later be challenged," and that
"[t]he mere existence of legitimate concerns about the validity of the projects[' self-
certifications] does not support the conclusion that [good] cause does not exist." It also
asserts that the Commission's "good cause" standard "must be read very broadly in an
action to enforce PURPA rights."

We addressed the Commission's "good cause" standard in *Jager v. State*,
and held: "[T]he Commission is not compelled to act by the mere filing of a complaint
nor can the [C]ommission arbitrarily deny relief to a [party] who can demonstrate a
sufficient probability that his complaint is valid."[65] We did not define "sufficient
probability," however; instead, we noted the Commission's "discretionary authority to
consider complaints and undertake . . . investigations,"[66] and we listed a number of
factors that the Commission may take into account when deciding whether to open an
investigation: "[T]he [C]ommission must be free to weigh the charges and data

---

[64]    *Chugach Elec. Ass'n*, 121 FERC 61,287 ¶ 33.

[65]    537 P.2d 1100, 1108 (Alaska 1975).

[66]    *Id*. at 1106.

presented and the costs to the public and the utility . . . to determine whether further proceedings are in the public interest."[67]

The Commission first articulated the "legitimate concerns" standard in a 2009 proceeding.[68] There, it found that the "legitimate questions" about a self-certified project's qualifying-facility status meant that "it [was not] in the public interest . . . to proceed on this complaint until the validity of [the project's] re-self-certification is known."[69] It particularly noted that "the project owner, who possess[ed] al[l] the pertinent information about [t]he project and [stood] to profit from the project," was in the best position to obtain a FERC ruling on the project's status.[70] In its brief, the Commission reiterates this point and points out the potential cost to ratepayers if MEA is required to assume the cost of challenging a project's qualifying-facility status in every instance.[71]

The Commission's interpretation of its "good cause" standard is entirely reasonable. It could have come to a different conclusion — for example, by adopting Alpine's argument that the "strong public interest in seeing cogeneration projects developed" dictates a more forgiving standard for questionable qualifying facilities. But

---

[67]     *Id.*

[68]     *KAPP, LLC v. Municipal Light & Power*, Docket U-09-067(1), Order No. 1 (Regulatory Comm'n of Alaska Aug. 19, 2009).

[69]     *Id.* at 6.

[70]     *Id.*

[71]     As the Commission points out, encouraging cogeneration projects is not the only purpose of PURPA; it was also intended to ensure "equitable rates to electric consumers." 16 U.S.C. § 2611 (2012).

the Commission has significant discretion over whether to initiate an investigation,[72] and in this case it has determined that when legitimate concerns exist regarding a project's qualifying-facility status, the public interest is best served by allocating the costs of obtaining a FERC ruling to the project owner, rather than to the utility. This decision was reasonable and within the Commission's discretion to make.[73]

### 3. The Commission was not required to hold an evidentiary hearing.

Alpine argues that the Commission should have held an evidentiary hearing before deciding, on the basis of the evidence before it, that no good cause existed to open an investigation. Alpine cites no support for this position, but asserts that "[i]f the Commission is going to weigh . . . evidence . . . , it must give Alpine an opportunity to present evidence and challenge the statement[s] of the utility in an evidentiary hearing." But the Commission's procedures do not provide any right to an evidentiary hearing on whether good cause exists to open an investigation.[74] Instead, the Commission must act "when a complainant brings evidence before it amounting to probable cause . . . that [his complaint is valid]."[75] Here, the Commission simply determined that Alpine had not presented evidence sufficient to justify opening an investigation. It was not required to hold an evidentiary hearing before making this determination.

---

[72] *Jager*, 537 P.2d at 1106.

[73] Because we affirm the Commission's decision to dismiss without prejudice all of Alpine's claims that depend on the qualifying-facility status of its projects, we do not address any of those claims here. Specifically, we do not address what should be included in Alpine's avoided-cost rates if its projects are qualifying facilities or whether the Commission's waiver of the specific tariff requirement is still valid.

[74] *See* 3 AAC 48.130.

[75] *Jager*, 537 P.2d at 1108.

**B. MEA Is Not Required To File A General Qualifying Facility Tariff Or The Data And Methodology Underlying Its Avoided-Cost Information.**

**1. These issues are partially moot.**

Alpine claims that the Commission's regulations require utilities to provide a general tariff for qualifying facilities and to provide the data and methodology underlying their avoided-cost disclosures. It argues that the Commission erred by failing to require MEA to do so. On November 20, 2015, however, the Commission amended the regulations on which Alpine bases this argument.[76] The new regulations are unambiguous; they do not require a general tariff or data and methodology. Alpine's claims on these points are therefore moot.

"[We] refrain from deciding questions where the facts have rendered the legal issues moot."[77] This includes situations where "the party bringing the action would not be entitled to any relief even if it prevails."[78] "If a regulation is amended, the case may become moot if the specific relief that the parties seek is no longer available."[79] This is because "[i]ssuing a decision regarding regulations that are no longer in effect is

---

[76] *In re Alaska Envtl. Power, LLC*, Order R-13-002(5) (Regulatory Comm'n of Alaska Nov. 20, 2015).

[77] *Ulmer v. Alaska Rest. & Beverage Ass'n*, 33 P.3d 773, 776 (Alaska 2001) (alteration in original) (quoting *O'Callaghan v. State*, 920 P.2d 1387, 1388 (Alaska 1996)).

[78] *Ahtna Tene Nené v. State, Dep't of Fish & Game*, 288 P.3d 452, 457 (Alaska 2012) (quoting *Ulmer*, 33 P.3d at 776).

[79] *Id.* at 458.

merely an academic exercise; it provides no explanation of a party's rights under the existing law."[80]

Even if Alpine's interpretation of the former regulations is correct, the relief it seeks is no longer available under the new regulations. The section on which Alpine relied for its general tariff argument, 3 AAC 50.790(a), now reads: "Not later than 60 days after receipt of a written request for interconnection from a qualifying facility, an electric utility shall file with the [C]ommission for its consideration a tariff *for . . . the requesting qualifying facility . . . .*"[81] The new regulation makes abundantly clear that, contrary to Alpine's argument, no tariff filing is required until a qualifying facility requests interconnection. And 3 AAC 50.790(e) now contains a complete list of the information that electric utilities are required to "compile and maintain for public inspection." The data and methodology underlying that information is not an item on that list.[82] Accordingly, even if the information Alpine seeks was once required, it is not now. Alpine is not entitled to any relief on these claims even if it prevails, and these claims are therefore moot.[83]

---

[80]     *Id*. at 457.

[81]     *In re Alaska Envtl. Power, LLC*, Order R-13-002(5) app. at 9 (emphasis added).

[82]     *See id*. app. at 10.

[83]     It is unclear whether Alpine is requesting only a current general tariff and data and methodology, or historic information as well. But the historic information would only be relevant if Alpine's projects are in fact entitled to an avoided-cost rate calculated as of some prior date, which is only the case if its projects are qualifying facilities. The Commission dismissed without prejudice all of Alpine's claims whose resolution depends on the qualifying-facility status of its projects. Because we approve of this procedure and therefore do not reach the dismissed claims, we do not address whether Alpine's claims to historic information are also moot.

We nevertheless retain the discretion to address moot issues, and will do so if the public interest exception applies.[84] We must therefore address "(1) whether the disputed issues are capable of repetition, (2) whether the mootness doctrine, if applied, may cause review of the issues to be repeatedly circumvented, and (3) whether the issues presented are so important to the public interest as to justify overriding the mootness doctrine."[85]

None of these factors are present here. "[W]e have refused to apply the public interest exception to . . . situations where the applicable statute or regulation was no longer in force."[86] Because 3 AAC 50.790 has been amended, there is no reason to believe that MEA's alleged violations of the former regulation will recur.[87] In the unlikely event that the Commission restores the former regulation, Alpine may raise its claims again in the same manner it raised them here. And the public interest is not served by "an advisory opinion on facts and law that are now largely irrelevant,"[88] such as a regulation that no longer exists.

For these reasons, Alpine's claims that the Commission's regulations require MEA to provide a general qualifying facility tariff and the data and methodology

---

[84]     *Ahtna Tene Nené*, 288 P.3d at 459.

[85]     *Id*. (quoting *Ulmer v. Alaska Rest. & Beverage Ass'n*, 33 P.3d 773, 777-78 (Alaska 2001)).

[86]     *Alaska Cmty. Action on Toxics v. Hartig*, 321 P.3d 360, 367 (Alaska 2014) (quoting *Ahtna Tene Nené*, 288 P.3d at 459).

[87]     *See Ahtna Tene Nené*, 288 P.3d at 459 ("These issues are not capable of repetition as this regulation is no longer in force and the subsequent amended versions are substantially different from the disputed [prior] version.").

[88]     *Alaska Cmty. Action*, 321 P.3d at 369.

underlying its avoided-cost information are moot. Because the public interest exception does not apply, we decline to address these claims.

## 2. Federal law does not require utilities to publish their data and methodology.

Alpine also argues that FERC's regulations require utilities to provide the data and methodology underlying their avoided-cost information. Alpine points to 18 C.F.R. § 292.302(e), which provides: "(1) Any data submitted by an electric utility . . . shall be subject to review by the State regulatory authority . . . . (2) In any such review, the electric utility has the burden of coming forward with justification for its data."[89] The justification requirement, Alpine claims, imposes a general obligation on utilities.

Alpine's interpretation of FERC's regulations is incorrect. It reads 18 C.F.R. § 292.302(e) to require Commission review of *all* avoided-cost information submitted by utilities, and to require utilities to justify all such information. But the regulation only provides that such information will be "*subject to* review."[90] This is not mandatory language. The plain text provides only that states *may* review the avoided-cost information provided by a utility and, that if the state does so, the utility must justify that information.

FERC added 18 C.F.R. § 292.302(e) to the rule at the end of the rulemaking process, in response to comments that "the proposed rule did not address the issue of validation of the data to be provided."[91] The initial proposed rule did not provide for *any*

---

[89]    18 C.F.R. § 292.302(e) (2015).

[90]    *Id*. § 292.302(e)(1) (emphasis added).

[91]    Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of PURPA, 45 Fed. Reg. 12,214, 12,219 (Feb. 25, 1980).

state review of such data.[92]  It would be odd for FERC to impose such a heavy reporting burden on utilities (and an onerous review requirement on states) as a last-minute alteration to the rule, and accordingly we believe that FERC simply intended to clarify that states may review the avoided-cost information provided by utilities as they deem necessary.

## V.    CONCLUSION

We DISMISS as moot the appeal regarding Alpine's claims to a general qualifying-facility tariff and to avoided-cost data and methodology.  We otherwise AFFIRM the decision of the superior court.

---

[92]    Small Power Production and Cogeneration — Rates and Exemptions, 44 Fed. Reg. 61,190, 61,203 (Oct. 24, 1979).